JOSÉ ABUDO SERVERA Y OTROS, demandantes y recurridos, *v.* AUTORIDAD DE TIERRAS DE PUERTO RICO, demandada y recurrente; FRANCISCO ABUDO SERVERA Y OTROS, querellantes y recurridos, *v.* AUTORIDAD DE TIERRAS DE PUERTO RICO, querellada y recurrente.

*Números:* R-76-68,     *Resueltos:* 24 de febrero de 1977
O-75-453

*José Alberty Orona,* abogado de la recurrente; *Antonio Figueroa Rivera,* abogado de los recurridos.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

El recurrido Francisco Abudo Servera, Administrador de una Finca de Beneficio Proporcional de la Autoridad de Tierras bajo el Título IV de la Ley Núm. 26 de 12 de abril de 1941, 28 L.P.R.A. sec. 461, demandó a la Autoridad por el importe de la labor extra que alega haber trabajado sin compensación, el pago de sus salarios desde el 7 de abril hasta el 31 de agosto de 1965, fecha en que cesó en su trabajo, y su participación en los supuestos beneficios devengados bajo su contrato. Reclamó la cantidad de cuarenta y dos mil dólares, más una suma igual por concepto de penalidad.

Los recurridos José Abudo Servera y Francisco Martínez Avilés radicaron otra querella análoga por ochenta mil dólares, más una suma igual por concepto de penalidad.

La Autoridad de Tierras adujo, entre otras, la defensa de que durante el período cubierto por ambas querellas los recurridos se desempeñaron como ejecutivos. Se celebró una vista por estipulación para dilucidar exclusivamente esta defensa. El Tribunal Superior resolvió que los querellantes no son ejecutivos. La Autoridad de Tierras acudió ante nos en solicitud de *certiorari* para revisar esta resolución. Este es el recurso aquí identificado como el O-75-453.

El segundo recurso aquí envuelto, el R-76-68, consolidado con el anterior, nace de una demanda de sentencia declaratoria incoada por los mismos tres querellantes contra la Autoridad, alegando que se le adeuda a cada uno una suma no menor de cien mil dólares por concepto de beneficios y participaciones dejados de percibir. Visto el caso en sus méritos, el Tribunal Superior determinó que se había creado entre las partes una sociedad civil. Acordamos revisar a petición de la

Autoridad de Tierras. Discutiremos separadamente ambos recursos.

## I

*La petición de certiorari—O-75-453.*

■ Cometió error el tribunal de instancia al determinar que los querellantes no eran ejecutivos. [1] La Regla 43.1 de Procedimiento Civil dispone en parte que: ". . . Las determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador de juzgar la credibilidad de los testigos. . . ." Hemos expresado, no obstante, que "aunque haya evidencia que las sostenga, las conclusiones de hecho de un Tribunal de anterior instancia se consideran claramente erróneas, si del examen de la totalidad de la evidencia el Tribunal de revisión queda definitiva y firmemente convencido que un error ha sido cometido, como es el caso en que las conclusiones de hecho están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida." *Maryland Casualty Co.* v. *Quick Const. Corp.,* 90 D.P.R. 329, 336 (1964). Las conclusiones de hechos efectuadas en el caso de autos no representan el balance más justiciero de la totalidad de la evidencia recibida.

Los años que comprenden las querellas exigen el examen de las definiciones del término "ejecutivo" que se encuentran en el Reglamento Núm. 13 original, aprobado por la Junta de Salario Mínimo y en vigor desde el 15 de enero de 1952 hasta

---

[1] Esta representa la tercera ocasión en que el Tribunal Superior pasa juicio sobre la interrogante que plantea este recurso. En las dos ocasiones anteriores, la misma sala había resuelto que los administradores de las Fincas de Beneficio Proporcional son ejecutivos *bona fide. Ortiz González* v. *Autoridad de Tierras,* Civil Núm. 58-7144, y *Cortés López y más de 40 Administradores de Fincas de Beneficio Proporcional* v. *Autoridad de Tierras,* Civil Núm. 59-1612.

el 14 de enero de 1960, (²) y el Reglamento Núm. 13 (Revisado) que comenzó a regir el 15 de enero de 1960. (³)

El Reglamento Núm. 13 original no distinguía entre el ejecutivo que realizaba actividades agrícolas y el dedicado a otras tareas, tales como la manufactura y el comercio. El término "ejecutivo" se definía así:

"Artículo I—El término Ejecutivo a los fines de la Sección 30 de la Ley de Salario Mínimo de Puerto Rico (Ley Núm. 8 de 5 de abril de 1941, según fue enmendada dicha Sección por la Ley Núm. 131 de 27 de abril de 1950) significa:.

(a) Cualquier empleado (1) cuyo deber primordial consista en la dirección de la empresa en que trabaja o en la dirección de un habitualmente reconocido departamento o subdivisión de la empresa; y

(2) que habitual y regularmente dirija el trabajo de otros dos o más empleados de la empresa o de tal departamento o subdivisión de la empresa; y

(3) que tenga la autoridad de emplear y despedir otros empleados o cuyas sugestiones y recomendaciones sobre el empleo y despido de otros empleados y en cuanto al mejoramiento y ascenso o en relación con cualquier otro cambio de status de otros empleados hayan de recibir especial atención; y

(4) que habitual y regularmente ejerza facultades discrecionales; y

(5) que no dedique más del 20% de las horas trabajadas en la semana de labor a actividades que no estén directa o íntimamente relacionadas con el desempeño del trabajo descrito en el párrafo (9), incisos (1) al (4) de este artículo; *Disponiéndose* que este inciso (5) no será aplicable en el caso de un empleado que esté solo a cargo de un establecimiento independiente o de una rama del establecimiento físicamente separado del

---

(²) La Ley Núm. 379 de 15 de mayo de 1948, que es donde por vez primera se excluyó a los ejecutivos, no definió el término. El Reglamento Núm. 13 original elabora el vocablo por primera vez. Sobre la situación jurídica previa a dicho Reglamento, véanse: *López Santos* v. *Tribunal Superior*, 99 D.P.R. 325, 330 (1970); *Morales* v. *Tribunal Superior*, 84 D.P.R. 123, 127 (1961).

(³) El Reglamento actualmente vigente es el Núm. 13 (Segunda Revisión), aprobado el 14 de junio de 1969, 29 R.&R.P.R. sec. 246e–6.

mismo, o que sea dueño de por lo menos el 20% del interés de la empresa en que esté empleado; y

(6) que reciba por sus servicios una compensación fija (por día, semana, quincena o períodos mayores) equivalente a un salario semanal no menor de $30.00, excluyendo alimentos, vivienda u otros servicios; o

(b) Cualquier empleado (1) cuyo trabajo cumple con los requisitos dispuestos en el párrafo (a), inciso (1) y (2) de este artículo; y

(2) que reciba por sus servicios una compensación fija (por día, semana, quincenas o períodos mayores) equivalente a un salario semanal, no menor de $100, excluyendo alimentos, vivienda u otros servicios."

El Reglamento Núm. 13 (Revisado) contenía en su artículo III(E) la siguiente exposición de los requisitos propios del empleado ejecutivo dedicado a actividades agrícolas de producción de caña:

"(1) Cualquier empleado que como encargado o mayordomo de una finca tenga a su cargo, total o parcialmente, la supervisión de la misma.

(2) que tenga autoridad para emplear y despedir otros empleados o cuyas sugestiones y recomendaciones sobre el empleo y despido de otros empleados y en cuanto al mejoramiento y ascenso o en relación con cualquier otro cambio de status de otros empleados, hayan de recibir especial atención;

(3) que habitual y regularmente ejerza facultades discrecionales;

(4) que reciba una compensación fija (por día, semana, quincena o períodos mayores) equivalente a un salario semanal no menor de treinta dólares ($30.00)."

■ Es doctrina establecida que para que surja la condición de "ejecutivo" es necesario que concurran todos los requisitos que los Reglamentos enumeran y que la exclusión de la legislación laboral sea clara. *Piñán* v. *Mayagüez Sugar Co., Inc.*, 84 D.P.R. 89, 97; *López Santos* v. *Tribunal Superior*, 99 D.P.R. 325, 330–331 (1970). Tal es el caso presente. Anali-

cemos la prueba desfilada a la luz de los factores reseñados en ambos Reglamentos.

1. *Deber primordial de dirigir la empresa o de un departamento o división habitualmente reconocida de la misma.*

La versión revisada del Reglamento expresa este requisito al disponer que es un empleado ejecutivo "cualquier empleado que como encargado o mayordomo de una finca tenga a su cargo, total o parcialmente, la supervisión de la misma."

Ambas versiones de este requisito se cumplieron. Del testimonio del recurrido Francisco Abudo Servera surge claramente que el Administrador de la Finca de Beneficio Proporcional:

—desempeñaba la supervisión general de la finca (T.E. 53) ;

—era el responsable de la finca y la cuidaba con celo (T.E. 139) ;

—era responsable del equipo que había en la finca (T.E. 127) ;

—escogía personalmente los obreros que trabajarían en el cultivo de la caña, luego que se le informaba el número que el presupuesto permitía emplear (T.E. 30–31, 120) ;

—asignaba los obreros a las piezas o cortes correspondientes o a las tareas que estimase necesarias (T.E. 74–75, 118–119) ;

—escogía a los obreros que continuarían trabajando durante el tiempo muerto y repartía el trabajo entre ellos (T.E. 120–122, 139) ;

—velaba porque se hiciera el trabajo correctamente para beneficio de la finca (T.E. 162) ;

—mandaba a los capataces y al listero (T.E. 39, 162–163, 173–174, 177) ;

—autorizaba el trabajo de horas extras (T.E. 123–124) ;

—decidía disputas sobre algunas horas no pagadas a un obrero (T.E. 124–125);

—firmaba la nómina y se preocupaba porque en ella no figurasen obreros que no hubiesen trabajado (T.E. 178) ;

—preparaba un presupuesto quincenal, sujeto a aprobación central (T.E. 35–36, 147) .

Esta enumeración demuestra que, en el balance de là prueba, los querellantes dirigían o estaban de hecho encarga-

dos de las fincas que administraban. Compárese: 29 C.F.R. 541.1. Es cierto que muchas funciones desempeñadas por los administradores de estas fincas estaban sujetas a controles centrales. Un empleado ejecutivo o un administrador no deja de serlo, no obstante, por el mero hecho de que sus decisiones y actuaciones estén sujetas a la aprobación de un empleado de superior rango. *Gilstrap* v. *Synalloy*, 409 F.Supp. 621, 625–626 (D.C.M.D. La. 1976). La determinación de si un empleado es o no ejecutivo no puede derivarse, además, en este caso de las circunstancias jurídicas que lo rodean. El concepto de las Fincas de Beneficio Proporcional y los contratos que se otorgan para administrarlas—cuestiones que discutimos en más detalle en la segunda parte de esta opinión —están intervenidas por ley que obliga a las partes. 28 L.P.R.A. sec. 461 *et seq.* La Ley de Tierras dispone que los administradores serán responsables de la propiedad y de los fondos bajo su custodia (28 L.P.R.A. sec. 461) ; que el arrendatario, término con el cual también se designa a los que, como los querellantes, tienen a su cargo la finca, "administrará la finca sujeto a las condiciones del contrato" (28 L.P.R.A. sec. 463(d)) ; y que "el arrendatario tendrá amplios poderes de contratar o no contratar el trabajo de los trabajadores residentes en la finca o de cualesquiera otros trabajadores" (28 L.P.R.A. sec. 463(e)). La ley naturalmente contempla que pueden establecerse controles centrales para la supervisión general de estas fincas. 28 L.P.R.A. sec. 463(g). Véase: *Fincas de Beneficio Proporcional: Información General, Funciones y Organización Administrativa*, Publicación de la Autoridad de Tierras, setiembre de 1957, pág. 8. La existencia de estos controles en modo. alguno significa que se les despoja a los administradores de estas fincas de su condición de ejecutivos, especialmente a la luz de los rigurosos requisitos que éstos deben reunir y de la amplitud de sus poderes. Véase el Reglamento para Fincas de Beneficio Pro-

porcional de 1944, según enmendado. 28 R.&R.P.R. sec. 461–1 *et seq.*

2. *Dirección habitual y regular del trabajo de dos o más empleados de la empresa.* (El Reglamento revisado suprime este requisito.)

Los administradores recurridos supervisaban cientos de empleados. (T.E. 117–122, testimonio de F. Abudo Servera y T.E. 289–290, declaración de Angel Iturbe.) Se cumplió obviamente con este requisito.

3. *Autoridad para emplear y despedir a otros empleados o especial atención a prestarse a las recomendaciones del administrador sobre dicho particular o en cuanto al mejoramiento, ascenso u otro cambio de status de otros empleados.* (Requisito común a ambos reglamentos.)

De la discusión referente a la primera condición se deduce que se cumplió también con este requisito. Véanse específicamente las siguientes partes del testimonio del señor Francisco Abudo Servera: T.E. 25, 31, 34, 118, 121–123, 129, 149; y de la declaración del señor Iturbe: T.E. 282–285, 300, 302 y 320; el Art. 65(e) de la Ley de Tierras, antes citado, 28 L.P.R.A. sec. 463(e); y la cláusula decimoquinta de los contratos de administración firmados por las partes, la cual reza así:

"El Administrador como ejecutivo a cargo de la Finca tendrá amplios poderes para emplear y despedir trabajadores. El Administrador estará en libertad para utilizar o no en las labores de la Finca a los trabajadores que residan en la misma o a cualesquiera otros trabajadores . . . ."

4. *El ejercicio habitual de facultades discrecionales.* (Ambos reglamentos exigen este requisito.)

El análisis de los factores que preceden ilustran igualmente el cumplimiento de este requisito.

5. *El requisito "que no se dedique más del 20% de las horas trabajadas en la semana de labor a actividades que no estén directa o íntimamente relacionadas con el desempeño*

*del trabajo descrito en los anteriores párrafos. Este requisito no es aplicable en el caso de un empleado que esté solo a cargo de un establecimiento independiente o de una rama del establecimiento físicamente separado del mismo, o que sea dueño de por lo menos el 20% del interés de la empresa en que está empleado.*" (Este requisito se suprimió en el reglamento revisado.)

Esta disposición no es aplicable al caso de autos. Las Fincas de Beneficio Proporcional gozan de personalidad separada y están a cargo, como hemos visto, de administradores como los querellantes recurridos. La cláusula primera de los contratos de Administración de Finca de Beneficio Proporcional dispone:

"La Finca objeto de este contrato es una empresa o entidad con personalidad separada y distinta de la Autoridad aunque es una creación de ésta.

En tal empresa el Administrador representa el interés suyo y el de todos los obreros que trabajen en la Finca no en relación de patrono y obrero, sino en la categoría de socios. . . ."

A tenor con esta disposición, la Finca de Beneficio Proporcional le paga a la Autoridad un canon por el uso de los terrenos (véase la cláusula quinta del contrato). Otras cláusulas del contrato (la cuarta, sexta, sétima, octava, vigésima, vigésimosexta, trigésimoprimera y trigésimosegunda) ponen también de manifiesto la separación existente entre la Finca y la Autoridad.

Aun bajo el supuesto de que el criterio bajo examen fuese de aplicación, el balance de la prueba no apoya la determinación de que los recurridos dedicasen más del 20% de sus horas laborables a tareas no relacionadas con las labores propias de un ejecutivo, tal como éstas se definen en los reglamentos citados. Es cierto que Francisco Abudo Servera declaró que dedicaba más del 20% de su tiempo a tales actividades, lo que motivó la siguiente determinación del tribunal de instancia:

"En la prestación de sus servicios, estos querellantes voltea-ban las fincas, transportaban peones para trabajar en las mis-mas, transportaban agua y abono y quemaban caña para ser cor-tada, dedicando a estas labores el 75% del tiempo de su trabajo."

Hemos escudriñado la prueba y de la misma se desprende que estas actividades se realizaban por los administradores tan solo en modo ocasional y que el tiempo envuelto era mucho más corto. (T.E. 158–160; 187–192, testimonio de Francisco Abudo.) Choca esta determinación, además, con la conclusión que, de ser ella cierta, no les restaba tiempo adecuado para el desempeño de las responsabilidades de supervisión admiti-damente a su cargo y antes reseñada.

6. *El recibo de una compensación fija equivalente a un salario semanal no menor de treinta dólares.*

Se satisfizo este criterio en el caso de los tres recurridos.

Valga apuntar que en este caso, en adición al cumpli-miento de los seis requisitos reseñados, los administradores vivían en casas provistas por la Autoridad de Tierras (T.E. 125); se les proveía un *jeep* y se les pagaba la gasolina (T.E. 127); la Autoridad les pagaba parte de la luz y el agua (T.E. 129); contrario a los obreros, se les permitía acumular vaca-ciones por enfermedad (T.E. 137–138); y disfrutaban de otros privilegios, vedados a los obreros, tales como disponer de un predio para hortaliza y tener ganado en terrenos de la Autoridad (T.E. 204–206).

■ Concluimos a la luz de lo anterior que los querellantes recurridos cumplen con todos los requisitos que la ley impone para validar la clasificación de ejecutivo. Se revocará la re-solución del tribunal de instancia.

## II

*El recurso de revisión—R-76-68*

A distinción del recurso que antecede, en que se resolvió por el tribunal de instancia que entre la Autoridad y los ad-ministradores de las Fincas de Beneficio Proporcional priva

la relación entre patrono y empleado, en el actual recurso se decidió que dichas partes son socios. Constituye un error tal determinación.

No están presentes en este caso los elementos que determinan el nacimiento de una sociedad, independientemente de su naturaleza civil o mercantil. Los nexos entre la Autoridad de Tierras y los administradores de las Fincas de Beneficio Proporcional se asemejan a los que distinguen otras figuras jurídicas, pero en realidad poseen contornos propios. A poco que se penetre en su naturaleza, puede constatarse que los contratos que se celebran entre la Autoridad de Tierras y los administradores de las Fincas de Beneficio Proporcional constituyen contratos atípicos.

Según Castán, son notas características del contrato de sociedad en general "la constitución de un fondo común con las aportaciones de los socios, y el intento de obtener, mediante las operaciones hechas en común, un lucro partible entre los socios y del que puedan participar todos." Castán, *Derecho Civil Español, Común y Foral*, Madrid, 1961, Tomo IV, pág. 522. El intento de obtener un lucro común partible se desdobla en tres postulados: la sociedad debe constituirse para fines de lucro; la ganancia ha de ser común a todos los socios; y la ganancia o la pérdida, en su caso, ha de repartirse entre los mismos. Sentencia de 27 de junio de 1960 (Esp.); Castán, *op. cit.*, 526–527. Véanse: Ripert et Boulanger, *Traité de Droit Civil*, Paris, 1958, Tomo III, pág. 713 *et seq.;* Aubry et Rau, *Droit Civil Francais*, París, 1951, 6eme ed. (par. Esmein), pág. 1 *et seq.; Encyclopédie Dalloz*, 1975, Tomo VI, "Societé Civile", par. 15. Varios autores requieren otro elemento para determinar la existencia de una sociedad, la *affectio societatis*, la intención especial de constituirla, de someterse específicamente a su régimen jurídico. *Encyclopédie Dalloz*, "Societé Civile", par. 31; Hamel, "L'affectio societatis", Rev. trim. dr. civ. 1925, pág. 761 *et seq.;* Castán, *op. cit.*, 528–530; Sentencia 12 de marzo de 1958 (Esp.), Sen-

tencia 21 de mayo de 1960 (Esp.) y Sentencia de 3 de diciembre de 1959 (Esp.).

Resumamos brevemente las circunstancias que llevaron a la creación de las Fincas de Beneficio Proporcional antes de examinar si cumplen sus contratos de administración con los requisitos de los contratos de sociedad.

Las Fincas de Beneficio Proporcional forman parte relevante de la política pública que produjo la Ley de Tierras de Puerto Rico. Su establecimiento persiguió fines públicos muy dispares de los que generalmente caracterizan la constitución de las sociedades privadas. Las Fincas de Beneficio Proporcional representaron un nuevo enfoque del problema de la tenencia de tierras en el país. Se quiso combatir el latifundio, pero sin caer en el minifundio. El ex-gobernador Tugwell describe así el propósito de esta creación de la Ley de Tierras:

"La ley insular poseía un rasgo de gran interés. Contenía un toque de inventiva genial que a veces su posesor escasamente reconoce. . . . Tal fue el caso del mecanismo denominado 'finca de beneficio proporcional', que parecía encerrar la posibilidad de preservar la agricultura a gran escala contra sus enemigos y de mantenerlo suficientemente separado de la cooperación clásica como para escapar la etiqueta de 'comunista'. De acuerdo con esta disposición, vastas porciones de grandes haciendas podrán arrendarse a empresarios cuya compensación sería parte de las ganancias (de 5 a 15%) ; las ganancias restantes se distribuían entre los trabajadores. Puede decirse que se mantenía el incentivo ortodoxo; se conservaba la eficacia de la agricultura a gran escala y se proveía para el disfrute por los obreros del beneficio de su labor." Tugwell, Rexford G., *The Stricken Land*, Greenwood Press, N.Y., 1968, pág. 87. (Traducción nuestra.)

Para la época en que se redactó la Ley de Tierras, una quinta parte de las tierras cultivables de Puerto Rico se dedicaban a la producción de caña de azúcar y más del 70% de los terrenos de caña eran controlados por compañías dominadas casi exclusivamente por absentistas. Concepción de Gracia, G.,

*The Land Authority of Puerto Rico*, 12 Geo. Wash. L. Rev. 302 (1944).

Para atacar esta situación se instituyeron procedimientos de *quo warranto* y de otra especie para desmembrar los grandes fundos. *Puerto Rico* v. *Rubert Hermanos, Inc.*, 309 U.S. 543 (1940). Se aprobó entonces la Ley de Tierras, Ley Núm. 26 de 12 de abril de 1941, en cuya Exposición de Motivos se consignó, como propósito de las Fincas de Beneficio Proporcional y de otras medidas creadas por dicha legislación, lo siguiente: ". . . se hace imperativa la adopción de una política agraria que redunde en una mayor y más equitativa distribución de las riquezas naturales del país y en una mayor libertad y dignidad económica para los habitantes de la zona rural." A tal efecto se dispuso en dicha Exposición que "se considera indispensable proveer para la creación de Fincas de Beneficio Proporcional en las que la difusión de la riqueza pueda ser alcanzada, hasta donde la eficiencia así lo aconseje, sin la división de la tierra." La importancia de estas fincas en el diseño de la Ley de Tierras se recalcó desde temprano. Un conocido estudioso de este programa escribió así, haciéndose eco de la opinión vertida por José Acosta Velarde, primer Director Ejecutivo de la Autoridad de Tierras: "No es exagerado decir que la clave de la política agraria de la Asamblea Legislativa reside en las fincas de beneficio proporcional. De su éxito o fracaso depende la totalidad de esa política." Concepción de Gracia, G., *supra*, 320–321.

De lo anterior se desprende que lo que impulsa la creación de las Fincas de Beneficio Proporcional no es ciertamente el ánimo de lucro. El lucro se utiliza como incentivo para algunas de las partes, como veremos más detalladamente dentro de breve, pero el estado persigue otros fines más amplios.

■ La estructura de la ley, así como los contratos otorgados a su amparo, demuestran que no existe sociedad de ningún género entre la Autoridad y los administradores de estas fincas. La sociedad que se establece, cuyos rasgos y

consecuencia no tenemos que dilucidar aquí, es entre los administradores y los trabajadores de estas fincas. La Autoridad no participa de modo alguno de las ganancias de las fincas. La Autoridad les cede en arrendamiento la finca a los administradores, 28 L.P.R.A. sec. 461, y cobra un canon fijo por ella (cláusula 47 del contrato). La Autoridad se reembolsa por gastos incurridos por los préstamos de refacción y molienda que otorgue, el uso de animales e implementos mecánicos y técnicos, las contribuciones que pague a nombre de la finca, gastos de contaduría y supervisión, anticipos, seguros y erogaciones análogas. La Autoridad no participa en las ganancias. La cláusula trigésimosegunda del contrato de administración dice expresamente:

"El Administrador acepta que todos los beneficios que la Finca produzca así como todas las obligaciones que contraiga, serán de la Finca como empresa. En sus funciones de Administrador y en lo que respecta a la Administración, acepta que representa tanto su interés como el de los trabajadores, siendo todos responsables del éxito, partícipes en los beneficios, y socios en la empresa."

La cláusula primera reitera la función limitada de la Autoridad, así como el hecho que entre el administrador y los obreros rige una relación de socios:

"La Finca objeto de este contrato es una empresa o entidad con personalidad separada y distinta de la Autoridad aunque es una creación de ésta. En tal empresa el Administrador representa el interés suyo y el de todos los obreros que trabajen la Finca no en relación de patrono y obrero, sino en la categoría de socios. La función de la Autoridad se limita a la creación de la Finca y a su supervisión, tanto en la parte agrícola como en la parte económica, de acuerdo con los términos de la Ley de Tierras de Puerto Rico."

Las ganancias que devengue la finca, si algunas, se determinan y distribuyen según las cláusulas trigésimocuarta y trigésimoquinta del contrato. Parte le toca al administrador y el resto a los trabajadores; la Autoridad de Tierras no tiene

derecho a participación alguna en el ingreso neto de estas fincas.

El esquema descrito revela la ausencia de varios elementos característicos de la sociedad en general. No puede afirmarse en realidad que se ha constituido en estos casos un fondo común con las aportaciones de los socios. Los administradores y la Autoridad no son socios, ni la Autoridad aportó unas tierras para la creación de un fondo social; la Autoridad *arrendó* unas tierras para el fomento de los fines sociales que la inspiran y su cultivo en sociedad aparte por administradores y obreros. En adición, no se da en estos casos el requisito indispensable de la división de ganancias y pérdidas y el historial de estas fincas, como hemos visto, revela que la fuerza que impulsó su creación no deriva del ánimo de lucro. Sin que nos pronunciemos, por ser ello innecesario, sobre el rol de la *affectio societatis* en la constitución de una sociedad, se deriva también de lo discutido que se carece aquí de este elemento.

■ Es difícil y peligroso subsumir contratos de historia tan singular y tantos rasgos propios en categorías contractuales familiares. Es cierto que tienen algunas características de los contratos de arrendamiento de cosas, arrendamiento de servicios, trabajo, aparcería y otros, pero los contratos de Fincas de Beneficio Proporcional se resisten a caber en estos moldes tradicionales. Son sencillamente contratos atípicos. Jordano, J. B., *Los Contratos Atípicos*, 195 Rev. Gen. de Leg y Jur. 51, 66 (1953). La comunidad de rasgos es a menudo despistante. Tal puede haber sucedido aquí, al advertirse que los administradores (así como los propios obreros) participan en las ganancias de estas fincas. La doctrina establece, no obstante, que la mera sustitución del salario por la participación en los beneficios no produce la creación de un contrato de sociedad. Castán, *Derecho Civil Español, Común y Foral*, 9ª ed., Tomo IV, pág. 438.

*Se revoca en consecuencia la decisión del tribunal de instancia y se devuelven los autos para procedimientos consistentes con esta opinión. Los administradores recurridos tendrán derecho exclusivamente a reclamar las sumas, si algunas, que puedan corresponderles por concepto de la compensación acordada bajo sus contratos. Entendemos de la lectura de los autos que la Autoridad ha negado que se produjesen ganancias en estas fincas bajo los términos de los referidos acuerdos. Esta es la única cuestión que quedaría por dilucidar, si es que los recurridos así lo solicitan.*

EL PUEBLO DE PUERTO RICO, en interés de la menor M. L. H.