MARCIAL CASTRO SOSA y OTROS, querellantes y recurridos, *v.* AUTORIDAD DE LAS FUENTES FLUVIALES DE PUERTO RICO, querellada y recurrente; SANTOS MORALES VICENTE y OTROS, querellantes y recurridos, *v.* AUTORIDAD DE LAS FUENTES FLUVIALES DE PUERTO RICO, querellada y recurrente.

*Número:* R-76-312      *Resuelto:* 16 de octubre de 1978

712

*Ramón A. Cancio, Carlos E. Lube* y *Luis F. Candal,* abogados de la recurrente; *Amadeo & Suro,* abogados de Marcial Castro Sosa y otros; *A. J. Amadeo Murga,* abogado de Santos Morales Vicente y otros.

PER CURIAM: Marcial Castro Sosa radicó querella contra la Autoridad de las Fuentes Fluviales. Reclamó el pago de horas extras trabajadas como capataz de operación y mantenimiento de líneas eléctricas durante los diez años precedentes a la querella. Varios otros (139) capataces, entre ellos Agustín García García, solicitaron intervención. La misma fue concedida. Santos Morales Vicente y otros 29 capataces radicaron otra reclamación de salarios por horas extras.[1] Se consolidaron los pleitos.

---

[1] Están ante nuestra consideración solamente los cómputos de dos querellantes: Marcial Castro Sosa y Agustín García García. En espera de nuestro dictamen se paralizaron los procedimientos en los casos de los restantes querellantes.

La querellada adujo como defensa afirmativa que los querellantes eran empleados ejecutivos. El tribunal de instancia desestimó la defensa.

▮ Consideraremos si es procedente la defensa de ejecutivo. Es postulado de nuestro derecho laboral el que solamente por excepción se excluya a un trabajador de la protección que su carácter de empleado le proporciona. *Sánchez* v. *Best Price Co., Inc.*, 102 D.P.R. 379 (1974); *López Santos* v. *Tribunal Superior*, 99 D.P.R. 325 (1970). Así, ". . . para que surja la condición de 'ejecutivo' es necesario que concurran todos los requisitos que los Reglamentos enumeran . . . ." *Abudo Servera* v. *A.T.P.R.*, 105 D.P.R. 728 (1977); *Labor Relations Reporter*, Vol. 6, *Wages and Hours*, BNA, Sec. 92.521; *Labor Law Reporter, Wages & Hours*, Sec. 25.210; Topical Law Reports, Commerce Clearing House; Sec. 8532.1, *Wage & Hour Guide*, Prentice Hall.

▮ Durante los 10 años que cubre la querella estaba vigente el Reglamento Núm. 13 de 1952 y su revisión aprobada en 1959. Véase *Piñán* v. *Mayagüez Sugar Co., Inc.*, 84 D.P.R. 89 (1961). Significa el término ejecutivo[2] según el citado Reglamento:

"A. Cualquier empleado (1) cuyo deber primordial consista en la dirección de la empresa en que trabaja o en la dirección de un habitualmente reconocido departamento o subdivisión de la empresa; y

(2) que habitual y regularmente dirija el trabajo de otros dos o más empleados de la empresa o de tal departamento o subdivisión de la empresa; y

(3) que tenga la autoridad de emplear y despedir otros empleados o cuyas sugestiones y recomendaciones sobre el empleo y despido de otros empleados y en cuanto al mejoramiento y ascenso o en relación con cualquier otro cambio de status de otros empleados hayan de recibir especial atención; y

---

[2] Mediante la Ley Núm. 379 de 15 de mayo de 1948 por primera vez se excluyen los ejecutivos del término "empleado". Fue el Reglamento Núm. 13, *supra*, el que estableció los seis requisitos de la exclusión.

(4) que habitual y regularmente ejerza facultades discrecionales; y

(5) que no dedique más del 20% de las horas trabajadas en la semana de labor a actividades que no estén directa e íntimamente relacionadas con el desempeño del trabajo descrito en el párrafo (a), incisos (1) al (4) de este artículo; Disponiéndose que este inciso (5) no será aplicable en el caso de un empleado que esté él solo a cargo de un establecimiento independiente o de una rama del establecimiento físicamente separado del mismo, o que sea dueño de por lo menos el 20% del interés de la empresa en que esté empleado; y

(6) que reciba por sus servicios una compensación fija (por día, semana, quincena o períodos mayores) equivalente a un salario semanal no menor de $30.00, excluyendo alimentos, vivienda u otros servicios; o

(B) Cualquier empleado (1) cuyo trabajo cumpla con los requisitos dispuestos en el párrafo (A), incisos (1) y (2) de este artículo; y

(2) que reciba por sus servicios una compensación fija (por día, semana, quincena o períodos mayores) equivalente a un salario semanal no menor de $100, excluyendo alimentos, vivienda u otros servicios."

El Reglamento Núm. 13, revisado, solamente modificó el requisito referente al sueldo mínimo, estableciendo una fórmula para computar el mismo. Así reza dicha modificación:

"(6) que reciba por sus servicios una compensación fija (por día, semana, quincena o períodos mayores) equivalente al sueldo semanal que resulte multiplicando por sesenta (60) el tipo mínimo por hora más alto que le sea aplicable por ley del Estado Libre Asociado de Puerto Rico o por decreto mandatorio de la Junta de Salario Mínimo de Puerto Rico a las actividades en conexión con las cuales ejerce sus funciones de ejecutivo, excluyendo alimentos, vivienda u otros servicios; disponiéndose, sin embargo, que el salario semanal nunca deberá ser menor de treinta y cinco dólares ($35.00) cuando dicha compensación computada en la forma ya expresada resultare menor de esta suma."

Postula el primer requisito del Reglamento Núm. 13 la facultad de dirección del ejecutivo. Conlleva este poder el uso de una plena discreción libre de una supervisión cons-

tante, para llevar a cabo aquellas ideas que propendan al mejor funcionamiento de la empresa o la unidad o departamento que el ejecutivo dirija. Véase: Wilson, *Labor Law Handbook* (ed. 1963), sec. 110.

Establece la prueba que la brigada—grupo de trabajo que dirige el capataz—es la unidad básica permanente, continua, más pequeña en la cual descansa el sistema administrativo de la Autoridad de las Fuentes Fluviales. Es la unidad de trabajo que cubre la construcción, el mantenimiento y la reparación de las líneas eléctricas.

Durante el tiempo que cubre la querella las brigadas de operación y mantenimiento se componían de alrededor de 8 hombres.([3]) Las de desganche se componían de alrededor de 5 personas incluyendo el chófer y el capataz.

Es el capataz el único miembro de la brigada con la responsabilidad de que las órdenes de trabajo sean cumplidas y que se efectúen con diligencia y eficacia en el menor tiempo posible. Aunque el orden en que se va a llevar a cabo el trabajo lo determina previamente el supervisor, el capataz asigna a cada empleado su tarea particular, dirigiendo así la labor de la brigada. La supervisión que recibe el capataz de sus superiores es mínima pues el empleado gerencial llamado a hacerlo—el supervisor de líneas—lo hace semanalmente y meramente por 15 minutos. A tenor con el "Manual Administrativo" de la Autoridad de las Fuentes Fluviales la supervisión ejercitada sobre los capataces era poco frecuente. Se dice de éstos: "El empleado se supervisa con poca frecuencia o a intervalos irregulares en base a los resultados generales logrados. En la mayor parte es dirigido en su operación por el procedimiento y la política generales de la agencia."

La dirección del departamento o división puede incluir, por ejemplo, la apreciación de la productividad de los emplea-

---

([3]) Las brigadas de operación y mantenimiento se componían de 2 celadores de líneas II, un celador de líneas II, un celador I, un chófer y el capataz.

dos a su cargo, la atención de sus quejas y el control del flujo y distribución de materiales. *Rodríguez* v. *Concreto Mixto Inc.*, 98 D.P.R. 579, 583 (1970). La prueba en el presente caso demuestra que, siendo el capataz el representante de la querellada en el campo, es éste el llamado a velar por la productividad de cada miembro de la brigada. Es la persona a la cual los empleados se dirigen al tener alguna queja contra otro empleado o problemas con el trabajo.

A pesar de que las requisiciones de los materiales a ser utilizados en las reparaciones venían previamente cumplimentadas por un oficinista, al llegar a las manos del capataz, era éste el que se encargaba de buscarlos y era el responsable de su buena utilización en el campo de trabajo.

■ El segundo aspecto se cumple. El capataz dirige usual y regularmente el trabajo de la brigada la cual siempre se compone de más de 2 empleados, cuya labor es supervisada constantemente por el capataz. Se ha interpretado que para cumplir el requisito, la dirección de 2 o más empleados puede ser con una frecuencia mayor que ocasional pero menos que constante. Sec. 8534.1, *Wage & Hour Guide*, Prentice Hall. Aquí lo es.

■ El tercer requisito enunciado en el Reglamento Núm. 13 establece el poder o facultad del empleado para emplear o despedir y el valor que sus sugerencias tienen para variar favorable o negativamente el *status* de sus subordinados. Esta facultad puede incluir el poder para emplear, transferir, suspender, volver a llamar, ascender, despedir, trasladar, compensar y disciplinar al subordinado. 2 Jenkins, *Labor Law*, Sec. 6.14.

■ Resulta ser éste el más importante de los requisitos que debe cumplir un ejecutivo. "Ningún empleado, esté alto o bajo en la jerarquía de la gerencia, puede ser considerado como un ejecutivo *bona fide* a menos que esté directamente relacionado con el empleo o despido u otro cambio en el *status* de sus subordinados, ya sea por acción directa o por recomen-

dación a aquellos cuyas funciones de empleo y despido han sido delegadas." Sec. 8535, *Wage & Hour Guide,* Prentice Hall.

Demuestra la prueba que aunque el supervisor de distrito es el empleado que firma los ascensos u otro cambio en los empleados, el capataz es quien inicia este proceso con sus recomendaciones verbales por el contacto que tiene a diario con el personal de la brigada. Es razonable que así sea porque el capataz es el único miembro de la gerencia de la Autoridad de las Fuentes Fluviales que está en continuo e íntimo contacto con sus empleados a todas horas, todos los días.

Aunque la totalidad de la prueba evidencia que eran los supervisores de líneas y los superintendentes los que firmaban las recomendaciones de ascenso, los formularios de ausencia de 3 días o más, los nombramientos temporeros o la extensión de éstos, el formulario de ausencia en horas laborables y la reclasificación de plazas; eran los capataces los que iniciaban todas estas variaciones en el *status* de sus empleados. Tan obvia resulta esta facultad que en el "Informe sobre reclasificación de los linemen, instaladores y troubleman [*sic*]" emitido en conjunto por la U.T.I.E.R. y la Autoridad de las Fuentes Fluviales, se le atribuye al capataz la facultad de seleccionar candidatos para ascensos. Así lee dicho informe en su parte pertinente: " . . . cuando el capataz o el supervisor conjuntamente con la Unión seleccionan como candidato para ascender a un Lineman I a II o II a III etc. . . ." (Pág. 5.)

■ Postula el cuarto requisito el ejercicio usual y regular por el ejecutivo de facultades discrecionales. Goza el capataz de la suficiente independencia de criterio para asignar a cada empleado su tarea, mantener la disciplina y el orden de la brigada a su cargo, velar por la seguridad y el adiestramiento de sus empleados.

· En cuanto a la determinación de horas extras los querellantes trataron de establecer que esta determinación la hacía el superintendente de líneas al ir la brigada diariamente a su trabajo. Resulta un tanto dudoso que las horas extras a ser trabajadas se señalaran de antemano. Es ésta una situación que en la mayoría de los casos surge de súbito y sin planificación alguna. Es el capataz la persona que por sus funciones gerenciales, debe determinar—y en efecto lo hace—el trabajo de horas extras. (Deposición Sr. Julio Negroni pág. 57.)

■ Para ser considerado ejecutivo éste no debe dedicar más del 20% de las horas semanales trabajadas a actividades que no estén directamente relacionadas con la labor usual y habitual de sus funciones.

■ La querellada trató de probar que el capataz no realizaba labor alguna. Sin embargo, la prueba demostró que los capataces realizaban tareas manuales tales como tirar líneas, ayudar a subir transformadores, hacer crucetas, preparar cables, hacer hoyos o a veces parar postes, pero que estas tareas no excedían el 20% de las horas trabajadas semanalmente. Es razonable que éstos ejerzan cierto grado de labor manual en la ayuda que prestan a sus subordinados. Se ha interpretado que si la labor manual está directa e íntimamente relacionada con los deberes primarios de dirección y administración el empleado es considerado ejecutivo. Aquí la labor manual es una que emana de la autoridad de dirección y supervisión de que gozan los capataces. Véase Nota, *Who is Employed in Executive or Administrative Capacity Within Exemptions From Minimum Wage and Maximum Hours Provisions of Fair Labor Standards Act*, 40 A.L.R.2d 332, Sec. 6.

■ El último requisito establece que la compensación que reciba el ejecutivo debe ser una fija ya sea por día, se-

mana, quincena o períodos mayores, que no rebase el mínimo establecido en el Reglamento Núm. 13, según ha quedado revisado. La prueba demuestra que los querellantes recibían una compensación fija anual devengada mensualmente, la cual rebasa por mucho los límites de la reglamentación laboral que nos ocupa.

Por establecer la prueba que los querellantes Marcial Castro Sosa y Agustín García García son ejecutivos, *procederá la revocación de la sentencia recurrida y se declarará sin lugar la querella.*

Los Jueces Asociados Señores Díaz Cruz y Negrón García no intervinieron.