Feliciano Acevedo, Jueza Ponente
*601 TEXTO COMPLETO DE LA SENTENCIA
La Sra. Ana Quiles Soto presentó el 10 de septiembre de 2003 recurso de Certiorari y “Moción urgente en auxilio de jurisdicción”. En síntesis, la peticionaria solicitó revisáramos la determinación emitida el 11 de agosto de 2003 por el Tribunal de Primera Instancia, Sala Superior de Aguadilla (en lo subsiguiente TPI). El foro de instancia decidió remover a la señora Carmen Soto Méndez del hogar de su hija y tutora, la peticionaria de epígrafe, y enviarla aun centro de envejecientes.
Mediante la moción en auxilio de jurisdicción, la peticionaria solicitó que ordenásemos el regreso de la Sra. Soto al su hogar hasta la final resolución del recurso. Inmediatamente requerimos, mediante resolución notificada a todas las partes, que todos los recurridos, Patrio, Elisa y William de apellidos Rivera Soto; la Procuradora Especial de Relaciones de Familia, Leda. Anaida I. Lamboy Sánchez y la Oficina de Asuntos para la Vejez que mostraran causa por la cual no debíamos conceder el remedio solicitado.
Mediante “Escrito en Cumplimiento de Orden” de 19 de septiembre de 2003, el Procurador General de Puerto Rico compareció en representación de la Procuradora Especial de Relaciones de Familia y la Oficina de Asuntos de la Vejez del Estado Libre Asociado de Puerto Rico, solicitando se conceda el remedio requerido por la peticionaria.
Sin el beneficio de la comparecencia de los recurridos Patrio, Elisa y William de apellidos todos Rivera Soto, y habiendo expirado el término concedido a esos fines, resolvemos expedir el auto y conceder el remedio solicitado.
I
El 16 de marzo de 2001, la peticionaria, Ana Quiles Soto solicitó se declarara incapaz mental a su madre, doña Carmen Soto Méndez, y se le nombrara su tutora legal, ya que su señora madre padecía de numerosas condiciones de salud como el alzhaimer y enficema cerebral, que le incapacitaban para administrar sus bienes y persona. La peticionaria adujo que era la persona más cercana a doña Carmen y capacitada para atender sus necesidades de salud y para administrar sus bienes. Tras celebrar vista al respecto, el TPI declaró Con Lugar la petición de declaración de incapacidad y nombramiento judicial de tutor. Así las cosas, nombró a la Sra. Quiles Soto tutora legal de su señora madre.
Posteriormente, Patrio, William y Elisa, de apellidos todos Rivera Soto, hijos de doña Carmen Soto, impugnaron el nombramiento de su medio hermana, Ana Quiles Soto, como tutora legal de su madre. Adujeron que ésta padecía de sus facultades mentales que le imposibilitaban ejercer la tutela de su madre. Además, señalaron que la peticionaria había violado los derechos a su madre de relacionarse con sus otros hijos. Más importante aún, no objetaron la declaración de incapacidad, pero cuestionaron el proceso, toda vez que no se le notificó del procedimiento judicial y que siendo hijos de doña Carmen alegaron ser parte indispensable en el caso.
Ante la objeción del nombramiento de la peticionaria como tutora judicial, el TPI celebró vista en la cual ordenó presentar copia del expediente médico psiquiátrico de la peticionaria y estableció un programa de visitas *602 para los hijos, Patrio y Elisa Rivera Soto. Posteriormente, el 11 de marzo de 2002, celebró otra vista en la cual ordenó al Dr. Tomás Larrieux, médico de la peticionaria, presentar un informe sobre su intervención médica con ésta. En esta ocasión, advirtió que de entender que se le estaba causando daño a doña Carmen, ordenaría al Departamento de la Familia que la ubique en un hogar. Además, el TPI dispuso que las relaciones entre don Patrio y su madre se dieran en el hogar de éste los miércoles y domingos.
En vista de seguimiento, don Patrio Rivera solicitó se dividiera la tutoría legal, entre éste y su hermana Ana Quiles Soto a los fines de que él administrara los bienes y ella se encargase del cuido de doña Carmen. El Tribunal no dispuso nada en cuanto a dicho requerimiento, pero mantuvo las relaciones entre hijo y madre. El 17 de mayo de 2002, la peticionaria presentó moción urgente ante el TPI solicitando que doña Carmen no saliera de la casa, toda vez que su salud se había quebrantado luego de estar expuesta a las visitas en el hogar de su hijo Patrio. Asimismo, en el informe anual de su gestión como tutora, la peticionaria adujo que desde el 2 de junio de 2002, doña Carmen no había podido salir de su casa, toda vez que estaba muy débil y había desarrollado un tic nervioso. Solicitó al TPI la paralización de las visitas. Nuevamente, el 19 de agosto de 2002, la peticionaria solicitó al TPI que en consideración al deterioro en el estado de salud de doña Carmen, reconsiderara su autorización de visitas a casa de su hijo, Patrio Rivera Soto. La peticionaria acompañó en dicha ocasión, certificaciones médicas que recomendaban que la Sra. Carmen Soto no fuera expuesta a cambios de ambiente y se le garantizare reposo absoluto. El Dr. Luis Freytes Lugo, neurólogo, indicó el 23 de julio de 2002 que doña Carmen padecía de “Organic Brain Syndrome”, “Senile Demeíia”, cambios cognoscitivos súbitos por lo cual cualquier cambio brusco de ambiente la desorienta. (Apéndice Petición de Certiorari, pág. 51). La Dra. Rosa I. Román Cario, neumóloga, indicó mediante comunicado escrito de 13 de agosto de 2002 que doña Carmen padece de una “enfermedad orgánica cerebral, enfermedad obstructiva crónica de pulmón, severa; que requiere cuidados persistentes, con conocimiento y responsabilidad. ” Añadió que no debía ser expuesta a cambios bruscos de temperatura, cambios en el ambiente, ni estar expuesta a mucha gente. (Apéndice Petición de Certiorari, pág. 52). Sin embargo, el foro de instancia dejó inalteradas las relaciones filiales entre doña Carmen y don Patrio Rivera, estableciendo que éste la podría visitar en la casa donde se encontraba la anciana. Añadió: “Se prohíbe a la Sra. Ana Quiles intervenir ni evitar dicha relación. ” (Apéndice Petición de Certiorari, pág. 54).
El 24 de abril de 2003, un nieto de doña Carmen presentó ante el TPI moción por derecho propio alegando que a ésta se le habían violentado sus derechos de visitas. Ante esta situación, el TPI dictó orden el 28 de abril de 20003 prohibiendo a la peticionaria interferir con las relaciones de los nietos de doña Carmen y ésta. Apercibió a la peticionaria que de recibir otra queja, ordenaría a la Oficina de Asuntos de la Vejez y al Departamento de la Familia ubicar a doña Carmen en un hogar de cuido. El 29 de mayo de 2003, el TPI recibió nuevamente una moción por derecho propio alegando que la peticionaria había interferido en las relaciones filiales. El 20 de mayo de 2003, la Oficina de Asuntos de la Vejez rindió Informe en el cual recomendó que las visitas a doña Carmen se coordinen como lo había ordenado el TPI y se determine quiénes podrán visitarla, considerando su estado de salud. Así las cosas, el TPI ordenó el 27 de mayo de 2003 visitas entre la incapaz y sus nietos los sábados. Tras nuevas quejas, el TPI celebró el 26 de junio de 2003 vista en la cual dilucidó la controversia de las relaciones filiales entre los hijos de doña Carmen y ésta. Las partes llegaron a un acuerdo provisional sobre visitas, el cual fue aceptado por el Tribunal y puesto en vigor inmediatamente. En dicha vista participó la Sra. Carmen Grajales de Jesús de la Oficina de Asuntos de la Vejez.
Posteriormente, el foro de instancia emitió Orden a los fines de requerir la comparecencia de la Oficina de Asuntos de la Vejez a la vista del 11 de agosto de 2003 en la cual se aprestaba a resolver la controversia sobre las relaciones filiales de doña Carmen y sus familiares. La Oficina de Asuntos de la Vejez debería informar al Tribunal si era más conveniente trasladar a la incapaz a un hogar de cuido de ancianos, en vista de que la peticionaria no había demostrado estar en disposición de diálogo a favor de su madre.
Finalmente, el TPI celebró vista el 11 de agosto de 2003 en la cual, con el beneficio de la comparecencia de todas las partes y de la Procuradora Especial de Relaciones de Familia, Leda. Anaida Lamboy y de la Sr. Carmen *603 Grajales por parte de la Oficina de Asuntos de la Vejez, declar[ó] CON LUGAR la solicitud de remoción y la razón para esta determinación es el bienestar de la incapaz, la cual se debe reubicar, ya que la incapaz se quedó sola en la casa y no hay comunicación entre las dos familias. (Apéndice Petición de Certiorari, págs. 76-77).
La Oficina de Asuntos de la Vejez se había expresado a favor de la remoción de la incapaz, puesto que en una ocasión en que personal de dicha entidad fue a visitar el hogar de la anciana la encontraron sola. (Véase carta suscrita por la Sra. Grajales el 31 de octubre de 2003, dirigida a la Hon. Juez Gladys Torregrosa de la Rosa, juez a cargo del caso en el TPI, Apéndice Petición de Certiorari, pág. 75).
Mediante comunicación escrita, la Oficina de Asuntos de la Vejez compareció nuevamente, en esta ocasión por conducto de la Supervisora de Servicios, Sra. Niurka I. Arce Torres, y el Director Ejecutivo Delegado, Sr. Samuel Paris. En la misma, señalaron que la institucionalización de un envejeciente es siempre el último recurso que recomiendan y que en vista del delicado estado de salud de la incapaz y de los cuidados, no cuestionados, brindados por su hija Ana Quiles, debía permanecer en el hogar de la peticionaria y resolver de otro modo las diferencias entre los familiares. La Oficina presentó una serie de recomendaciones entre las que se encontraban, el utilizar el dinero que aportarían los hijos para el pago de un ama de llave que pudiera cuidar de la anciana en el hogar de la peticionaria, mientras realizaba sus diligencias, sin descuidar a su señora madre; libre acceso a las visitas, aunque se establezca un horario; utilizar los servicios de la Oficina para mediar entre los familiares y supervisar las relaciones entre éstos y la anciana.
En la vista de seguimiento celebrada el 19 de agosto de 2003, el TPI discutió la comunicación antes referida y rechazó admitirla evidencia, toda vez que la misma había surgido luego de que la peticionaria solicitara a la Oficina una revisión de las recomendaciones previamente comunicadas al Tribunal en el caso de epígrafe. Por su parte, la Procurada Especial de Relaciones de Familia, defensora judicial de la incapaz, se expresó en contra de la posición adoptada por la Oficina de Asuntos de la Vejez y a favor de la remoción de la anciana del hogar de su hija. El TPI se mantuvo en su determinación de localizar a la anciana en el hogar de cuido Casa Matilde. Señaló “que no tiene duda de que la Sra. Ana Quiles es adecuada en el cuidado de la Sra. Carmen Soto, pero en el área de la comunicación con sus demás hermanos no ha mejorado.” (Apéndice Petición de Certiorari, pág. 95). 
En desacuerdo con ello, la Sra. Ana Quiles Soto presentó el recurso de epígrafe. En el mismo alegó que:

“Erró el Tribunal de Instancia al reubicar a la señora Carmen Soto en un centro de cuido en lugar de determinar que por el bienestar de ésta, debía permanecer en el hogar de la apelante. ”

En síntesis, aduce que hubo prejuicio y error manifiesto en la determinación recurrida, ya que la misma va en contra del bienestar y seguridad de doña Carmen Soto, toda vez que el mismo foro a quo había determinado consistentemente que la envejeciente se encontraba bien cuidada en la casa de la peticionaria. El Procurador General coincide con la posición de la peticionaria y arguye que existen otras alternativas menos drásticas para resolver la controversia de marras, la cual a la postre se circunscribe a diferencias entre hermanos.
Es norma reiterada de nuestro ordenamiento que las determinaciones de los tribunales de instancia deben ser objeto de gran deferencia, en ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto. Rolón v. Charlie Car Rental Inc., 148 D.P.R. 420 (1999); Belk Arce v. Martínez, 146 D.P.R. 215 (1996); Orta v. Padilla Ayala, 137 D.P.R. 927 (1995); Cooperativa de Seguros Múltiples v. Lugo, 136 D.P.R. 203 (1994); Benitez Guzmán v. García Merced, 126 D.P.R. 302 (1990); Riley v. Rodríguez Pacheco, 119 D.P.R. 762 (1987); Pueblo v. Miranda Ortiz, 117 D.P.R. 188 (1986); Pérez Cruz v. Hospital La Concepción, 115 D.P.R. 721 (1984).
Asimismo, en aquellos casos en los cuales el juzgador haga determinaciones al amparo del poder discrecional que le confiere un estatuto o regla, éstas deberán ser respetadas por los foros apelativos, a menos que se *604 demuestre arbitrariedad, un craso abuso de discreción, una determinación errónea que cause grave perjuicio a una de las paites, o la necesidad de un cambio de política pública procesal o sustantiva. Cf. Lluch v. España Service Sta., 117 D.P.R. 729 (1986); Ex Parte Valencia, 116 D.P.R. 909 (1986); Ortiz Rivera v. Agostini, 92 D.P.R. 187 (1965).
Dicha norma se encuentra plasmada en la Regla 43.2 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 43.2, la cual reitera que sólo cuando las determinaciones sean claramente erróneas o producto de pasión, podrán ser alteradas. Claro está, tales determinaciones no son inmutables. Aunque el arbitrio del juzgador de hechos es respetable y merece deferencia, no es absoluto, y una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de los foros apelativos. Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8, 14 (1987). Por ello, aunque haya evidencia que sostenga las conclusiones de hecho del Tribunal, si de un análisis de la totalidad de la evidencia este Tribunal queda convencido que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, éstas han de considerarse claramente erróneas. Abudo Servera v. A.T.P.R., 105 D.P.R. 728 (1977). Ello porque el arbitrio del juzgador, aunque respetable y merecedor de deferencia, no es absoluto. La apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal apelativo. Véanse Méndez v. Morales, 142 D.P.R. 26, 40 (1996); Rivera Pérez v. Cruz Corchado, supra.
El 12 de julio de 1986 se aprobó la Ley Núm. 121, la cual establece los derechos y la política pública prevaleciente en torno a las personas de edad avanzada. 8 L.P.R.A. § 341-347. Dicha ley define el concepto de “personas de edad avanzada” como aquéllas de sesenta (60) años de edad o más. 8 L.P.R.A. § 341(b). La Ley tiene como propósito fundamental declarar los derechos de la persona de edad avanzada dentro de nuestro ordenamiento, prevaleciendo el respeto a sus derechos individuales y la protección de su salud física y mental y de su propiedad. Establece, entre otras cosas, que la persona de edad avanzada tiene derecho a que el Estado le garantice los servicios y medios que faciliten su permanencia, siempre que sea posible, con su familia, siendo la última alternativa la institucionalización de éste en un hogar sustituto. 8 L.P.R.A. § 341. Entre los derechos reconocidos a la persona de edad avanzada se destacan el:

“(c) Vivir en un ambiente de tranquilidad, respeto y dignidad que satisfaga las necesidades básicas de vivienda, de alimentación, de salud y económicas, con atención a sus condiciones físicas, mentales, sociales, espirituales y emocionales.

(d) Vivir libre de presiones, coacciones y manipulaciones por parte de familiares, personas particulares o del Estado, que estén dirigidas a menoscabar su capacidad y su derecho a la autodeterminación.

(e) Recibir atención médica en su fase preventiva, clínica, y de rehabilitación para la protección de su salud y su bienestar general.

(m) Disfrutar de un ambiente de tranquilidad y solaz.” (8 L.P.R.A. § 343, énfasis suplido).
Un análisis desapasionado de los hechos y de las circunstancias que generaron este recurso, nos llevan a concluir que el foro de instancia erró en su proceder.
La determinación recurrida fue tomada sin considerar y colocar como prioridad los mejores intereses, el bienestar y la seguridad de doña Carmen Soto, la tutelada. En casi todas las intervenciones del TPI, éste se expresa a favor de la remoción de la anciana del hogar de la apelada. Insistentemente señala el TPI que la peticionaria no promueve las relaciones filiales entre su madre y demás hijos, sin destacar, aunque lo reconoce, la encomiable labor que realiza en el cuido de su señora madre. Dicho foro colocó como prioridad la controversia de *605 las relaciones entre hermanos a la seguridad e integridad de la doña Carmen Soto. Olvidó proteger la salud de una anciana, que lamentablemente no puede hacer valer por derecho propio sus derechos.
En reiteradas ocasiones, tanto el TPI como la Oficina de Asuntos de la Vejez reconocen que la peticionaria cuidaba de la anciana y tenía control sobre el tratamiento médico de ésta. El foro de instancia no reconoció en su determinación el cuidado, esmero y dedicación profesada por doña Ana Quiles Soto hacia su madre durante los últimos 27 años en los cuales ha cuidado a la anciana. Nadie ha cuestionado la labor de la peticionaria como tutora en cuanto al cuidado y atención de todas las necesidades de la incapaz como ser humano. Contradictoriamente, de los autos se desprende que luego de la remoción de la anciana al Hogar Matilde, ésta ha tenido que ser recluida en dos ocasiones en el Hospital Buena Vista por complicaciones de salud. A todas luces, la salud de doña Carmen se ha afectado adversamente desde que tuvo que abandonar lo que constituyó por largos años su hogar e ingresar al llamado “hogar de cuidó".
De otra parte, el TPI rechazó admitir en evidencia la última comunicación cursada por la Oficina de Asuntos de la Vejez, toda vez que la misma surgió luego de que la peticionaria solicitara revisión de las recomendaciones previas de dicha Oficina en el caso. El foro a quo señaló lo siguiente: “Una parte no puede comparecer a una agencia para que el Tribunal cambie su decisión. Eso está mal." Ignoró el TPI que fue él mismo quien le dio foro a la Oficina de Asuntos de la Vejez en el caso de epígrafe y le solicitó su intervención. Además, es dicha Oficina quien tiene la autoridad en ley de velar por los derechos de la persona de edad avanzada. 3 L.P.R.A. §§ 1953, 1955 y 1970. De los autos se desprende que dicha Oficina ha desarrollado un plan de trabajo para el caso de epígrafe el cual recomienda que:

“1. Que la señora Soto sea mantenida en un ambiente familiar junto a la hija, la Sra. Ana Quiles, quien está dispuesta a tenerla en su hogar y ha demostrado por años mantener un cuidado adecuado de la madre.

2. Que dada la condición física de la señora Soto y puesto que la señora Quiles necesita hacer diligencias en ocasiones, los demás hijos aporten para el pago de un ama de llaves durante un mínimo de 3 horas al día de 3-5 días a la semana para que la señora Soto no quede sola bajo ninguna circunstancia.

3. Dadas las discrepancias entre hermanos, se recomienda llevar a cabo una reunión familiar junto a las siguientes agencias o programas ASUME (Prospera), Oficina del Procurador de Familia, Mediación de Conflictos y Oficina Asuntos de la Vejez, Región Sur. Se podrá fijar horarios de visitas para cualquier familiar que interese ver a la señora Carmen Soto sin interferir en el cuidado de ésta.

4. Dar seguimiento cada uno o dos meses por parte de las agencias para verificar el bienestar de la señora Soto y que el acuerdo entre hermanos no sea violado poniendo en riesgo la salud y estabilidad de la Sra. Carmen Soto. ’’

Por entender que dicho plan recoge y protege los derechos esenciales de la anciana, adoptamos el mismo y se ordena se ponga en vigor inmediatamente. La Oficina de Asuntos de la Vejez debe continuar interviniendo en el caso como mediador entre los hermanos y protector de los derechos de la Sra. Carmen Soto. .
II
A la luz de las circunstancias antes reseñadas y el derecho aplicable, se revoca el dictamen del foro de instancia y se ordena la devolución inmediata de la Sra. Carmen Soto Méndez al hogar de su tutora legal, la Sra. Ana Quiles Soto. Se devuelve el caso al TPI para que continúe los procedimientos acorde con lo establecido en esta Sentencia.
Notifíquese inmediatamente vía teléfono, fax y correo ordinario al Tribunal y todas las partes.
*606 Lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIO 2003 DTA 151
1. De la comparecencia del Procurador General se desprende que el TPI emitió el 12 de septiembre de 2003 Resolución en la que recoge lo previamente resuelto en las vistas de 10 y 19 de agosto de 2003 y notificado mediante minutas de 3 y 2 de septiembre de 2003, respectivamente.