Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| | | |
|---|---|---|
| D C VERRENGIA<br><br>Recurrida<br><br>v.<br><br>JUSTIN ANTHONY VERRENGIA<br><br>Peticionario | KLCE202400622 | *CERTIORARI,* **acogido como Apelación,** Procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Civil Núm.: BY2022RF00483 (4003)<br><br>Sobre: Alimentos |

Panel integrado por su presidenta, la Juez Brignoni Mártir, el Juez Candelaria Rosa, la Jueza Álvarez Esnard y la Jueza Díaz Rivera.

Álvarez Esnard, jueza Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 23 de julio de 2024.

Comparece Justin Anthony Verrengia (señor Verrengia o el Apelante) y solicita la revocación de la *Resolución* emitida y notificada el 18 de enero de 2024 por el Tribunal de Primera Instancia Sala de Bayamón (TPI o foro primario). Mediante la referida *Resolución* el foro primario acogió el Informe sometido por la Lcda. Lissette Domenech Sánchez, Examinadora de Pensiones Alimentarias (EPA) y fijó la pensión alimentaria que debe pagar el señor Verrengia en beneficio de la menor Q.Y.S.V., para distintos periodos, a partir del 23 de marzo de 2022 hasta el presente.

Se acoge el recurso presentado por el señor Verrengia como una Apelación sin alterar su designación alfanumérica y se confirma la *Resolución* sobre alimentos emitida por el foro primario.[1]

---

[1] En *Figueroa v. Del Rosario*, 147 DPR 121 (1998) el Tribunal Supremo resolvió que debido a la naturaleza *sui géneris* de los pleitos de familia, los dictámenes que emita el Tribunal de Primera Instancia sobre alimentos y custodia, que modifican o intentan modificar alguna determinación final previa al respecto, por haber

Número Identificador

SEN(RES)2024_____

**I**

El 23 de marzo de 2023, la señora DC Verrengia t/c/c DC Sterlin (señora Sterlin o la Apelada) presentó Demanda sobre custodia, pensión ex cónyuge y alimentos de menor en contra del Apelante.[2] En ajustada síntesis, la Apelada alegó que el 20 de octubre de 2011 contrajo matrimonio con el Apelante; que el 12 de diciembre de 2019 dicho vínculo matrimonial se disolvió mediante Escritura de Divorcio otorgada ante la Notaria Nelly Isabel Pujals González y que ambos son los progenitores de la menor Q.Y.S.V., nacida el 1 de febrero de 2014 en el estado de Florida. En lo pertinente, la Apelada solicitó al foro primario que estableciera una pensión alimentaria a beneficio de la menor Q.Y.S.V., a ser satisfecha por el señor Verrengia.

El 4 de mayo de 2022, se celebró una vista de alimentos ante la EPA a la que compareció la señora Sterlin, representada por el Lcdo. José Asencio Quiles y prestó testimonio. El Apelante no compareció. En esa ocasión, conforme a la prueba desfilada por la Apelada, el foro primario calculó la pensión alimentaria provisional en $7,385.84 mensuales.[3]

Posteriormente, el 16 de agosto de 2022, la EPA celebró una segunda vista de alimentos en la que tras considerar que hubo un cambio de vivienda en donde residía la menor con la Apelada, el gasto por dicho concepto se redujo de $4,500.00 a $3,300.00 mensuales, efectivo en junio de 2022. Por lo tanto, quedó

---

ocurrido un cambio en las circunstancias, constituyen propiamente sentencias de las cuales se puede apelar. Ello, porque tales determinaciones no son resoluciones en sí, pues adjudican y resuelven una reclamación entre las partes, según los hechos y las circunstancias existentes en el momento en que ésta se resuelve. *Otero Vélez v. Schroder Muñoz*, 200 DPR 76, 86 (2018); *Cortes Pagan v. González Colon*, 184 DPR 807, 813, (2012); *Figueroa v. Del Rosario*, 147 DPR 121 (1988). Véase además, *Jusino González v. Norat Santiago*, 211 DPR 855 (2023); *Pesquera Fuentes v. Colón Medina*, 202 DPR 93 (2019).

[2] *Véase* páginas 1-6 del Apéndice de la *Petición de Certiorari*.

[3] *Véase* página 145 del Apéndice de la *Petición de Certiorari.*

modificada la pensión alimentaria provisional mensual a $6,796.10, efectivo el 1 de septiembre de 2022 y retroactivo al 1 de junio de ese año.[4]

Al respecto, el 28 de noviembre de 2022, la señora Sterlin presentó Demanda Enmendada para incluir como codemandada en el pleito de alimentos a MY ALCHEMY, LLC, toda vez que el señor Verrengia es empleado de dicha corporación y su único socio. Sobre esos extremos la Apelada alegó en la Demanda Enmendada que el señor Verrengia confundió sus ingresos personales con los de la corporación MY ALCHEMY, LLC, por lo que solicitó descorrer el velo corporativo.[5]

En síntesis, una vez concluido el descubrimiento de prueba, el 27 de febrero de 2023, el foro primario celebró vista evidenciaria para descorrer el velo corporativo, a la que comparecieron las partes con sus respectivos abogados y estipularon prueba documental. En dicha vista prestó testimonio el señor Verrengia. Así las cosas, mediante *Resolución* emitida el 24 de marzo de 2023 el foro primario declaró sin lugar la solicitud para descorrer el velo corporativo.[6] Sin embargo, en esa ocasión el foro primario hizo, entre otras, las siguientes determinaciones de hechos:

> [...]
> 10. El codemandado Justin A. Verrengia es el único miembro que controla los ingresos que recibe la codemandada MY ALCHEMY LLC.
> [...]
> 13. Todo tipo de actividad económica del codemandado Justin A. Verrengia es depositado en la(s) cuenta(s) de banco de la codemandada MY ALCHEMY LLC.
> [...]
> 40. Los BITCOINS pertenecientes al codemandado Justin A. Verrengia, los utiliza para sostener sus gastos.

---

[4] *Id.*
[5] *Véase* Apéndice 1 de la *Oposición a que se Expida el Auto de Certiorari.*
[6] *Id.*

41. El codemandado Justin A. Verrengia utiliza una cuenta en COIN BASE para sostener sus gastos con los BITCOINS.

[...]

43. Es a través de COINBASE que el codemandado Justin A. Verrengia convierte los BITCOINS en dólares.

44. Una vez el dinero es convertido utilizando COINBASE, el dinero no es transferido a MY ALCHEMY.

45. Las cuentas de BITCOINS del codemandado Justin A. Verrengia son personales.

[...]

49. En la cuenta de banco de MY ALCHEMY LLC. existen las siguientes transacciones personales del codemandado Justin A. Verrengia. Pagos a: [...], RETIRO POR LA CANTIDAD DE $602,795.50 PARA EL PRÉSTAMO DE LA CASA, OTROS RETIROS PARA LA COMPRA DE LA CASA, RETIRO DE $98,000.00 PAR EL PAGO DE LA CASA[...]

50. El codemandado Justin A. Verrengia utiliza la cuenta MY ALCHEMY LLC. para pagar algunos gastos personales no relacionados con el negocio.

51. **La codemandada MY ALCHEMY LLC tomó a través de un préstamo, la cantidad de $800,000.00**

[...]

53. El 22 de marzo de 2022 el codemandado Justin A. Verrengia realizó una transacción en la cuenta de la codemandada MY ALCHEMY LLC., por la cantidad de $800,000.00

54. **La transacción efectuada el 22 de marzo de 2022 por el codemandado Justin A. Verrengia por la cantidad de $800,000.00 fue con el propósito de comprar una casa en Bayamón**.

55. **Según el testimonio del codemandado, a quien le damos entero crédito, dicho préstamo fue saldado por el codemandado Justin A. Verrengia con unos BITCOINS que tenía.** [7]

Concluido dicho trámite procesal, el 31 de marzo de 2023, las partes enviaron a la EPA Informe Conjunto con las siguientes estipulaciones:

## I.  ESTIPULACIONES DE HECHOS

**1. Gastos suplementarios estipulados.**

    a. El gasto actual de renta de la propiedad en donde reside la menor es de $3,300. mensuales.

    b. En dicha propiedad viven dos (2) personas.

    c. La menor practica el deporte de Soccer. El costo es $750.00 anual, lo que equivale a $62.50 mensual.

    d. La menor necesita equipo para practicar el deporte del soccer.

---

[7] *Véase Apéndice* 1 de la *Oposición a que se Expida el Auto de Certiorari.*

e. La menor practica Gimnasia. El costo es de $35.00 semanal y se calcula en $1,470.00 anual, lo que equivale a $122.50.

f. La menor necesita equipo para practicar el deporte de Gimnasia.

g. El padre que pague alguno de los gastos de deportes o del equipo necesario para el mismo, tendrá derecho a reclamar reembolso del otro padre, de acuerdo al porciento de suplementaria que se determine en este caso.

## 2. Otras estipulaciones

### a. Sobre las partes

i. Las partes se divorciaron a través de escritura número 8, el 12 de diciembre de 2019.

ii. La menor nació el 11 de febrero de 2014, y al día de hoy tiene nueve (9) años de edad.

iii. Actualmente la menor estudia en la modalidad de "homeschooling". No se estipula el tiempo que pasa estudiando.[8]

iv. Se estipula que el demandado paga $2,400 anuales por concepto de cuota de mantenimiento de la residencia donde vive.

v. […]

vi. […]

vii. […]

### b. Sobre ingresos del demandado

i. Se estipulan las determinaciones de hechos número 1,5,6,7,8,16,17 y 45 de la Resolución del 24 de marzo de 2023, notificada el 27 de marzo de 2023. Dichos hechos son:

1. El codemandado Justin A. Verrengia trabaja para la codemandada MY ALCHEMY,LLC.

2. El codemandado Justin A. Verrengia es el único miembro de la Compañía o Sociedad codemandada MY ALCHEMY LLC.

3. El codemandado Justin A. Verrengia se dedica a ser "podcaster".

4. El codemandado Justin A. Verrengia posee un podcast diario en un canal de "Youtube" donde presenta noticias relacionadas a criptomonedas.

5. El codemandado Justin A. Verrengia trabaja para la codemandada MY ALCHEMY LLC. como "podcaster".

---

[8] Esto cambió ya que, efectivo en agosto de 2023, la menor comenzó a estudiar en el colegio Saint John's School.

6. Para el año contributivo 2019, 2020 y 2021, el codemandado Justin Verrengia reportó en su Planilla de Contribución sobre Ingresos, que devengó como empleado de la codemandada MY ALCHEMY INC. LLC. un salario bruto de $30,000.00 anuales.

7. Para el año contributivo 219,2020 y 2021, el codemandado reportó unos ingresos mensuales como empleado de la codemandada MY ALCHEMY INC: LLC. por la cantidad de $2,500.00 mensuales.

8. Las cuentas de BITCOINS del codemandado Justin A. Verrengia son personales.

ii. Sin que se entienda como el único ingreso, se estipula que en 2021, el demandado tuvo ingresos por venta de criptomonedas de $10,995.00

iii. El 31 de marzo de 2022, el demandado adquirió una propiedad en la Urbanización Riviera Village, por el precio de $700,000.00, propiedad que está libre de gravámenes.[9]

Tras varios incidentes procesales el 11 y 12 de mayo de 2023, el 6 y 7 de julio y el 7 y 8 de septiembre de ese año, la EPA celebró vistas sobre alimentos de menor. Las partes comparecieron con sus respectivos abogados y con intérpretes. El primer testigo en declarar como perito consultor fue el Sr. Nelson O. Traverso Rodríguez, contador público autorizado (CPA). Tanto la señora Sterlin como el señor Verrengia prestaron testimonio. Asimismo, en las vistas celebradas, las partes presentaron prueba documental admitida por la EPA.[10]

El 16 de enero de 2024, la EPA sometió *Informe de la Examinadora de Pensiones Alimentarias* en el que, tras analizar la prueba desfilada y los testimonios presentados bajo juramento formuló las siguientes determinaciones de hechos:

---

[9] *Véase* Entrada Núm. 322 de SUMAC.
[10] *Véase* Entrada Núm. 372 de SUMAC

DETERMINACIONES DE HECHOS [11]

1. Las partes tienen una hija, Q.Y.S.V., quien nació el 11 de febrero de 2014.

2. La menor reside junto a su madre, en Dorado, Puerto Rico.

3. La Sra. D C Verrengia no trabaja. Al presentarse la solicitud de alimentos el 23 de marzo de 2022, la señora Verrengia no trabajaba porque se dedicaba al cuido de la menor y era quien estudiaba con la niña bajo la modalidad de "homeschooling". Así estuvo hasta que la menor fue matriculada en colegio, en agosto de 2023.

   Al día de hoy, continúa desempleada; aunque alega no consigue empleo porque no habla español.

   Considerando lo antes expresado, se hicieron los cómputos de pensión imputándole dos ingresos a la promovente: $870.40 mensuales porque no trabajaba para dedicarse al cuido (y darle clases) a la menor; y, $1,160.00 mensuales desde agosto de 2023 ya que la menor estudia en colegio y, puede conseguir algún empleo, por lo menos, durante el horario escolar.

   Según declaró en la vista celebrada el 6 de julio de 2023, "la familia y la iglesia la ayudan económicamente" y, con esa ayuda, la señora Verrengia cubre todos sus gastos. No se presentó evidencia de ello. Tampoco pudo precisar la ayuda exacta recibida ya que varía.

4. El Sr. Justin A. Verrengia trabaja como "podcaster". El señor Verrengia declaró tener un ingreso de $2,500.00 mensuales. Dicho ingreso lo recibe de su corporación.

De la Planilla de Información Personal y Económica presentada por el Sr. Justin Verrengia se reflejan gastos que ascienden a $3,115.25 mensuales (Exhibit 22).

Para evidenciar el ingreso del señor Verrengia, éste presentó como perito al Sr. Nelson Traverso Rodríguez, CPA. Exh. 1, Curriculum Vitae del perito CPA. El señor Traverso declaró en la vista ante la Examinadora que este era el primer caso de alimentos en que comparecía como testigo en un Tribunal; sin embargo, la importancia del testigo fue dar luz en cuanto al trato que se debe dar a las criptomonedas para poder determinar los ingresos de una parte al computar una pensión alimentaria.

El perito declaró que las criptomonedas son unas representaciones digitales de un valor que sirve como medio de intercambio; no son equivalente a dinero efectivo, sino que se pueden vender o intercambiar por dinero. Lo importante, para efectos del caso de pensión alimentaria es que al realizar una transacción de compra y venta de criptomonedas se pueden generar ingresos.

El señor Traverso declaró que no existe una legislación que regule las criptomonedas; por lo que para propósitos contributivos, lo que se utilizan son unas guías dadas en el Servicio de Rentas Internas de Estados Unidos (IRS); (IRS Notice 2014-21). El perito declaró que se debe tomar en consideración el valor original de la criptomoneda versus el valor al momento en que se dispone de la misma

---

[11] *Véase* páginas 145- 168 del Apéndice de la *Petición de Certiorari*, Entrada Núm. 407 de SUMAC.

(Exh. 2), para poder determinar algún ingreso. Es decir, cualquier ganancia se debe calcular al momento en que se dispone de la criptomoneda. Énfasis nuestro.

El perito declaró en cuanto al análisis realizado en su informe (Exh.2) para determinar los ingresos del señor Verrengia; para lo cual analizó los años contributivos 2020, 2021 y 2022, por concepto de salario, dividendos y ganancias en criptomonedas. Aún cuando el análisis fue realizado para propósitos contributivos, sirvió a la Examinadora como parámetro para determinar ingresos del señor Verrengia. Es decir, para propósitos contributivos, el perito consideró una serie de deducciones que no aplican para efectos de establecer una pensión alimentaria. Entre esas "deducciones mandatorias (contribuciones y otras exigidas por ley)" están:

• Donativos a entidades sin fines de lucro, según requerido por la Ley 22- 2012 - $5,000.00.

• Importe de informe anual Ley 22 – 2012 - $5,000.00. Veamos el análisis realizado por el perito en su informe:

**Cómputo de ingreso neto para los años 2020, 2021 y 2022.**

|  | 2020 | 2021 | 2022 |
|---|---|---|---|
| **Ingreso Bruto** | | | |
| Salarios | $ 30,000 | $ 30,000 | $ 30,000 |
| Dividendos | 58,998 | 77,016 | - |
| Ganancias en criptomonedas (*Véase Anejo A*) | - | 10,955 | - |
| Ingreso bruto anual | $ 88,998 | $ 117,971 | $ 30,000 |
| **Deducciones mandatorias (contribuciones y otras exigidas por ley)** | | | |
| Contribuciones (7.65% FICA) | $ (2,295) | $ (2,295) | $ (2,295) |
| Donativo a entidades sin fines de lucro, según requerido por Ley 22-2012 | (5,000) | (5,000) | (5,000) |
| Importe de informe anual Ley 22-2012 | (5,000) | (5,000) | (5,000) |
| Total de deducciones | $ (12,295) | $ (12,295) | $ (12,295) |
| **Ingreso Neto** | $ 76,703 | $ 105,676 | $ 17,705 |

$10,000.00 cada año

| Ingreso promedio 2020-2022 | |
|---|---|
| Ingreso bruto | $ 78,990 |
| Deducciones | (12,295) |
| Ingreso neto promedio anual | $ 66,695 |
| Ingreso neto promedio mensual | $ 5,558 |

Cómputo de ingreso para los años 2020, 2021 y 2022

|  | 2020 | 2021 | 2022 |
|---|---|---|---|
| **Ingreso Bruto** | | | |
| Salarios | $30,000 | $30,000 | $30,000 |
| Dividendos | 58,998 | 77,016 | - |
| Ganancias en criptomonedas (*Véase anejo A*) | - | 10,995 | - |

Esas deducciones mandatorias, según el CPA, y que fueron marcadas (X) por la Examinadora, pudieran aplicar cuando se rinden las Planillas de Contribución sobre Ingresos pero, no aplican a casos de alimentos; por lo que no se puede hacer esa deducción total de $10,000.00 anuales.

La Examinadora añadió una deducción, no considerada en el cómputo realizado por el perito CPA, pero que el señor Verrengia tiene derecho a recibir: $875.00 de contribuciones sobre ingresos pagados. Véase Exh. 2, página 6.

La tabla presentada por el perito en su informe, además de ingresos, incluye dividendos y ganancias en criptomonedas, para llegar a un ingreso bruto anual.

El perito declaró e incluyó en su informe el ingreso recibido por el promovido por concepto de dividendos de su compañía My Alchemy, para la cual el señor Verrengia es el único accionista. Esos dividendos son beneficios que recibe de su compañía.

Los dividendos que recibe el promovido de su compañía, son cuantías adicionales al salario que recibe de la misma compañía.

El señor Verrengia como único accionista es quien decide si se van a pagar dividendos o no.

En el año 2020 la compañía declaró dividendos. Según el informe del perito, el señor Verrengia recibió ese año $58,998.00 (Exh. 2) en dividendos; sin embargo, según los libros de la corporación y en la planilla corporativa aparece una distribución de dividendos por la cantidad de $420,765.00 para el año 2020 (Exh. 9, página 3). Cuando una compañía declara dividendos, la cantidad se distribuye entre sus accionistas. El único accionista de la compañía My Alchemy es el señor Verrengia; por lo que los $420,765.00 fueron recibidos únicamente por él como beneficio de su compañía. Según la planilla presentada, ese dinero "se distribuyó en efectivo". **Para efectos del cómputo de la pensión, consideramos como dividendos recibidos en el año 2020, la cantidad de $420,765.00. En el año 2021, el señor Verrengia recibió $77,016.00 en dividendos. Dicha cantidad no está en controversia.**

Para el año 2022, la compañía My Alchemy, LLC no declaró dividendos según expresó el señor Verrengia y se desprende del informe preparado por el perito CPA; por lo que no se consideró ningún ingreso adicional bajo dicho concepto durante ese año. No se presentó prueba en contrario, como se hizo con el año 2020, en donde se presentó la Planilla de Contribución sobre Ingresos para negocio de My Alchemy, LLC, a los únicos efectos de cuestionar y contradecir lo declarado por el señor Verrengia en su Planilla de Contribución sobre Ingresos de Individuos, año contributivo 2020.

**En relación a las ganancias por concepto de venta de criptomonedas, el perito CPA solo incluyó la cantidad de $10,955.00 recibidas en el año 2021.** El promovido no recibió ganancias en criptomonedas para los años 2020 ni 2022, según el informe. Dicha información le fue provista al perito por el propio promovido.

**En el año 2022, el señor Verrengia se compró una propiedad valorada en $700,000.00, a través de un préstamo emitido por Block Fi y dicho préstamo fue saldado con unos Bitcoins que tenía. Dicha transacción fue evidenciada. De hecho, de la Resolución dictada el 24 de marzo de 2023 por la Hon. Marisol Díaz Guerrero, entrada núm. 286, determinación de hecho núm. 49, se desprende que en la cuenta de banco de My Alchemy, LLC existen varias transacciones personales del señor Verrengia; entre ellas, "Retiro por la cantidad de $602,795.50 para el préstamo de la casa, otros retiros para la compra de la casa, retiro de $98,000.00 para el pago de la casa…"**

**En el Exh. 10, sobre el último estado de la cuenta Block Fi se evidencia el préstamo de negocio adquirido por el señor Verrengia por la cantidad inicial de $803,200.00. Véase entrada 265 de SUMAC.**

<u>Unos meses después</u> de haber adquirido el préstamo, el señor Verrengia lo pagó en su totalidad usando el colateral de "bitcoin". Según declaró el señor Verrengia, esas criptomonedas fueron las que él retuvo en la división de bienes gananciales.

Para la fecha del divorcio de las partes, 12 de diciembre de 2019, cada criptomoneda tenía un valor de $7,243.00. Para el 31 de mayo de 2022 cada criptomoneda tenía un valor de $31,792.00; lo que representa una diferencia (ganancia) de $24,549.00 por 20.7 criptomonedas vendidas para saldar el préstamo = $508,164.30[12] ÷ 12 = $42,347.02 mensuales.

El señor Verrengia declaró no tener dinero para pagar su pensión y no se preocupa por saber dónde están unas criptomonedas que tenía en el año 2022, valoradas en $917,165.56 ($440,381.88 y $476,783.68); que, como vemos, no se trata de una cantidad nominal. A preguntas de la propia Examinadora, el señor Verrengia declaró, bajo juramento, desconocer dónde están esas criptomonedas. Véase Exh. 25 (a)(b).

El ingreso del señor Verrengia del año 2022, a nuestro juicio, resulta ser sustancialmente mayor al declarado de $30,000.00 anual o $2,500.00 mensuales.

Para efectos del cómputo de pensión, imputaremos al señor Verrengia, como ingreso del año 2022, lo siguiente: <u>$30,000.00</u>[13] y <u>$508,164.30</u> de ganancia obtenida al vender las criptomonedas para comprar su actual residencia; para un total de $538,164.30 anual bruto o $44,847.03 mensual bruto.

Llamamos la atención del Tribunal que, conforme con el Exh. 5, el valor de las criptomonedas comenzó a bajar sustancialmente.  Para el 1 de enero de 2022, abrió a $46,311.75 y cerró a $47,686.81; y, para el 31 de diciembre de 2022 bajó sustancialmente su valor abriendo a $16,603.67, cerrando en $16,547.50.  Esto evidencia lo volátil o cambiante que resulta el valor de las criptomonedas al momento de disponer de ellas. Para el año 2023, el valor de las criptomonedas comenzó a subir. Del exhibit 5 se desprende que, para el 28 de marzo de 2023, al cierre, estaba en un valor de $27,259.17.

El señor Verrengia declaró que para poder pagar la pensión alimentaria provisional establecida y cubrir sus gastos ha tenido que solicitar dinero prestado:

> $41,000.00 de su mamá
>
> $12,000.00 de un amigo
>
> $ 5,000.00 de otro amigo (efectivo)
>
> $98,654.00 de su compañía "My Alchemy"[14]
>
> $28,000.00 de Prolific

---

[12] Ganancia en la venta de criptomonedas.

[13] Ingreso como empleado de su corporación y que no está en controversia.

[14] Para pagar la pensión alimentaria y gastos legales, según declaró.  El señor Verrengia hizo un ofrecimiento de prueba de la Planilla de Contribución sobre Ingresos de la corporación para evidenciar el préstamo.  Fue objetada la presentación de la misma por no haberse informado previamente.

+ $ 9,700.00 de amigos

$194,354.00 en préstamos para el año 2022.

**El señor Verrengia declaró que no ha podido devolver el dinero recibido en calidad de préstamo ya que su capacidad económica no se lo ha permitido. Sin embargo, no se presentó prueba testifical ni documental que acredite que el dinero fue recibido en calidad de préstamo; tampoco se presentó prueba en contrario. El promovido declaró que tomó dinero prestado y que no ha podido devolverlo. No especificó la manera en que se llevaría a cabo la restitución del dinero prestado. La Examinadora no consideró las sumas de dinero que el señor Verrengia declaró, bajo juramento, que recibió como préstamos; de la misma manera que no consideró el dinero recibido en calidad de préstamo por la parte promovente de su mamá, familiares y de la iglesia.**

**Tabla sobre ingresos del señor Verrengia modificada por la Examinadora conforme con la evidencia presentada:**

| Ingreso | 2020 | 2021 | Ingreso | 2022 |
|---|---|---|---|---|
| Salario | $ 30,000.00 | $ 30,000.00 | Salario | $ 30,000.00 |
| Dividendos | + $420,765.00 | + $ 77,016.00 | Dividendos | + 0 |
| Ganancias en criptomonedas | + 0 | + $ 10,955.00 | Ganancias en criptomonedas vendidas | + $508,164.30 |
| | = $450,765.00 | $117,971.00 | | = $538,164.30 |
| Contribuciones | - $ 875.00 | - $ 875.00 | Contribuciones | - $ 875.00 |
| SS 7.65 % (FICA) | - $ 2,295.00 | - $ 2,295.00 | SS 7.65 % (FICA) | - $ 2,295.00 |
| | = $447,595.00 neto | $114,801.00 neto | | = $534,994.30 neto |
| ÷ 12 meses = Ingreso mensual neto | $ 37,299.58 | $ 9,566.75 | ÷ 12 meses = Ingreso mensual neto | $ 44,582.86 |

**Ingreso Promediado (3 años evaluados)**

$30,483.06

| | | |
|---|---|---|
| | | $37,299.58 |
| | + | 9,566.75 |
| Ingreso promediado = | + | 44,582.86 |
| | | $91,449.19 |
| Años evaluados | ÷ | 3 |
| Ingreso mensual neto promediado del señor Verrengia = | | **$ 30,483.06** |

5. El gasto de vivienda de la propiedad en donde residía la promovente con la menor era de $4,500.00 mensuales. Luego, la Sra. D C Verrengia se mudó y el pago de vivienda se redujo a $3,300 mensuales, efectivo en junio de 2022. En dicha residencia viven dos personas.

6. La Sra. D C Verrengia era quien se encargaba de educar a la menor desde su hogar (homeschooling).

7. La menor comenzó a estudiar en el colegio Saint John´s School desde agosto de 2023: año escolar 2023-2024.

8. El gasto por "homeschooling" era el siguiente:

   – DKC – club de niños de Dorado – $600.00 X 3 sesiones por año – $1,800.00 ($150.00 mensuales).

   – Abeka – $1,200.00 anual ($102.50 mensuales) – grupo de clases y actividades interactivas.

   – MEL Science – $903.23 anual ($75.27 mensuales) de clases y actividades interactivas.

$1,000.00 – DKC

$1,230.00 – Abeka

+ $   903.23 – MEL Sciene

Total: $3,933.23 ÷ 12 = $327.77 mensuales (Exhibit 13).

9. El costo del colegio es de $15,868.00; lo cual equivale a $1,322.33 en un cómputo mensual por los doce meses del año (Exhibit 23).

10. La menor practica varios deportes:

a) soccer - $750.00 anual = $62.50 mensuales (estipulación 1-c).

b) gimnasia - $1,470.00 anual = $122.50 mensuales (estipulación 1-e).

c) tenis - $45.00 semanales = $195.00 mensuales X 10 meses ÷ 12 = $162.50 mensuales.

d) baloncesto - $35.00 semanales= $151.67 mensuales X 10 meses ÷12= $126.39 mensuales.

11. El señor Verrengia proveerá plan médico para beneficio de la menor.

12. El día 19 de octubre de 2023, la Hon. Marisol Díaz Guerrero dictó una Resolución estableciendo, provisionalmente, lo siguiente:

Relaciones Filiales - Comenzando el 2 de noviembre de 2023 al 4 de enero de 2024 el padre se podrá relacionar con la menor fuera del proyecto Encuentro, fines de semanas alternos comenzando los jueves a la hora de salida de la escuela hasta lunes a la hora de entrada.

Custodia compartida - Del 5 de enero de 2024 en adelante, se establece un plan de custodia compartida en semanas alternas en tiempo igual, de viernes a viernes. Es decir, la madre entregará a la menor el viernes a la hora de entrada de la escuela a las 8:00 a.m. y el padre recogerá a la menor ese día a la hora de salida a las 3:00 p.m.

...ordenando a la Examinadora tomar nota sobre el cambio de relaciones filiales y la concesión provisional de la custodia compartida en tiempo igual desde el 5 de enero de 2024, al momento de hacer su recomendación de pensión alimentaria.

Surge de la Resolución que el horario del colegio es de 8:00 a.m. a 3:30 p.m. Si el señor Verrengia se va a relacionar con la menor, en fines de semana alternos, desde el jueves, 2 de noviembre de 2023, a las 3:00 p.m. hasta el lunes a las 8:00 a.m., se relacionará un total de 356 horas en un periodo de 4 bisemanas.

J 24 horas

V 24 horas 24 horas X 3 días = 72 horas hasta las 3:00 p.m. S 24 horas

D 9 horas de 4 p.m. a 12 m. + 8 horas de 1:00 a 8:00 a.m. = 17 horas

L

72 +17 = 89 horas X 4 bisemanas = 356 horas

Durante ese periodo, el señor Verrengia se relacionó un 24.3 % del tiempo con la menor. (356 horas ÷ 1,464 = 24.3 %) (61 días[15] X 24 horas = 1,464 horas = 24.3 %)

Efectivo el 5 de enero de 2024, se estableció custodia compartida en tiempo igual. Esto quiere decir que, al computar la pensión alimentaria, no se considerará el pago de vivienda de ninguna de las partes. Art. 22 (2)(a) del Reglamento. En el caso de autos, no se consideraría solamente el pago de vivienda de la señora Verrengia ya que el señor Verrengia no tiene pago por vivienda. Siguiendo con el plan de relaciones paterno filiales establecidos, el señor Verrengia comenzaría a relacionarse, en igualdad de tiempo, con la menor desde el viernes, 12 de enero de 2024 (la semana del 5 de enero de 2024, le correspondería a la señora Verrengia). Quiere decir que ambas partes se relacionarán 4,380 horas al año con la menor.

Cómputos de pensión alimentaria por períodos, considerando todos los cambios ocurridos durante cada periodo:

**23 de marzo de 2022 (fecha de la solicitud) a mayo de** 2022.

Conforme con las Guías mandatorias para computar las pensiones alimentarias en Puerto Rico, al señor Verrengia le correspondería pagar la suma de $3,090.38 en pensión alimentaria básica y el 97.22 % de los gastos suplementarios los cuales asciendan a $3,222.77 para una pensión suplementaria de $3,133.30.

La pensión alimentaria que el señor Verrengia debió pagar durante ese periodo, conforme con las Guías, era de $6,223.68 mensuales.

> Junio de 2022 a julio de 2023
>
> $3,090.38 – pensión alimentaria básica
>
> + $2,549.96 – pensión suplementaria
>
> $5,640.34 mensuales (considera el cambio en el gasto de vivienda, el cual se redujo).
>
> Agosto de 2023 a octubre de 2023
>
> $3,079.95 – pensión alimentaria básica
>
> + $3,319.89 – pensión alimentaria

$6,399.84 mensuales (considera vivienda, mensualidad de colegio y deportes (soccer, gimnasia, tenis y baloncesto).

Noviembre de 2023 y diciembre de 2023 $3,079.95 ajustada al 24.3% del tiempo de relaciones paterno filiales [$3,079.95 X 24.3 % = $748.43 ($3,079.95 - $748.43 = $2,331.52)] =

> $2,331.52
>
> + $3,319.89
>
> $5,651.41 mensuales
>
> 17 Enero de 2024 en adelante
>
> Considerando la custodia compartida 50/50:

El señor Verrengia tendría que pagar una pensión alimentaria básica, ajustada, de $1,539.98 y una pensión

---

[15] Noviembre (30 días) y diciembre (31 días) = 61 días.

suplementaria de $1,730.37. La obligación total que correspondería pagar, conforme con las Guías, es de $3,270.35 mensuales.

La señora Verrengia tendría que pagar una pensión alimentaria básica, ajustada, de $58.60 y una pensión suplementaria de $65.85. La obligación total que correspondería pagar, conforme con las Guías, es de $124.45 mensuales.

Al compensar una pensión alimentaria con la otra, el señor Verrengia tendría que pagar una diferencia de $3,145.90 mensuales, efectivo en enero de 2024.

> $3,270.35 – señor Verrengia a la señora Verrengia
>
> - $ 124.45 – señora Verrengia al señor Verrengia
>
> $3,145.90 – señor Verrengia a la señora Verrengia

El señor Verrengia aportará el 96.33 % de los gastos de la menor y, la señora Verrengia aportará el 3.67 % de los gastos. La pensión alimentaria considera la aportación del señor Verrengia al gasto anual de colegio (llevado a un cómputo mensual) y deportes (soccer, gimnasia, tenis y baloncesto).

El señor Verrengia deberá pagar el 96.33 % de los gastos anuales de libros, materiales escolares, uniformes; además del 96.33 % de cualquier gasto médico que no cubra el plan que está obligado a proveer, previa presentación de la evidencia.

Considerando que el señor Verrengia cubre el 96.33 % de los gastos de la menor y que el gasto de colegio es de $15,868.00 anual o $1,322.33 por los doce meses del año, recomendamos que se ordene al señor Verrengia pagar el colegio y, se le reste ese pago de la pensión alimentaria. Es decir, pagaría el colegio directamente y se le restaría de la pensión mensual la suma de $1,322.33. Su obligación sería $1,823.576 mensuales a pagarse a través de ASUME y el 100 % del gasto total de colegio; incluyendo los almuerzos en el colegio que paga actualmente. La aportación de la señora Verrengia está incluida en el cómputo realizado.

De igual forma, en el referido Informe, la EPA hizo las siguientes recomendaciones al foro primario:

**RECOMENDACIONES**

1. **Fije la pensión alimentaria para beneficio de la menor, considerando los distintos periodos:**
   a. **Del 23 de marzo de 2022 a mayo de 2022-$6,223.68 mensuales.**
   b. **De junio de 2022 a julio de 2023-$5,640.34 mensuales.**
   c. **De agosto de 2023 a octubre de 2023-$6,399.84 mensuales.**
   d. **Noviembre de 2023 y diciembre de 2023-$5,651.41 mensuales.**
   e. **De enero de 2024 en adelante-$3,145.90 mensuales.**

> **La pensión alimentaria deberá pagarse de la siguiente manera: 100% de la matrícula del colegio ($15,868.00 anual o $1,322.33 mensuales); incluyendo almuerzos que paga en la actualidad, directamente al colegio de la menor y, la diferencia de $1,823.57 mensuales a través de ASUME.**
>
> 1. **Ordene al Sr. Justin Verrengia proveer el plan médico para beneficio de la menor.**
>
> 2. **Ordene al señor Verrengia a pagar el 97.22% de los gastos médicos de la menor hasta julio de 2023. Efectivo en agosto de 2023 su aportación es de 96.33%. Esos mismos porcientos deberá pagar en relación a los gastos de libros, efectos escolares, uniformes y equipos que necesite para practicar los deportes de soccer, tenis, baloncesto y gimnasia, previa presentación de la evidencia.**
>
> 3. **Instruya al alimentante de su responsabilidad de informar al tribunal de cualquier cambio de patrono o salario que tenga, así como también del acceso que tenga a cualquier cubierta de plan médico a un costo razonable.**
>
> 4. **Haga cualquier otro pronunciamiento que en derecho proceda.[16]**

Mediante *Resolución* emitida y notificada el 18 de enero de 2024 el TPI aprobó el Informe sometido por la EPA, lo hizo formar parte de la *Resolución* y fijó la pensión alimentaria en beneficio de la menor Q.Y.S.V., que debe pagar el señor Verrengia para distintos periodos, a partir del 23 de marzo de 2022 hasta el presente, conforme a las recomendaciones de la EPA.

En desacuerdo, el 2 de febrero de 2024, el señor Verrengia presentó *Moción de Reconsideración a Resolución*.[17] En esencia, el Apelante sostuvo que incidió la EPA al determinar que este vendió las criptomonedas y al concluir que el señor Verrengia tuvo ingresos de $44,847.03 mensuales. De igual forma arguyó el Apelante que incidió la ELA al imputar dividendos por $420,765.00 para el año 2020 y al no considerar los créditos aplicables al Sr. Verrengia así como los cálculos.

---

[16] *Véase* páginas núm 167-168 del Apéndice de la *Petición de Certiorari*. Entrada Núm. 407 de SUMAC
[17] *Véase* páginas 179-191 del Apéndice de la *Petición de Certiorari*

Mediante *Resolución* emitida el 2 de mayo de 2024, notificada el 6 de mayo de ese año, el foro primario declaró sin lugar la *Moción de Reconsideración a Resolución* presentada por el Apelante.

Inconforme, el señor Verrengia comparece ante nos mediante el recurso de epígrafe y señala la comisión de los siguientes errores por parte del foro primario:

> ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL CONCLUIR QUE EL SR. VERRENGIA DEVENGÓ DIVIDENDOS EN EL 2020 Y VENDIÓ LAS CRIPTOMONEDAS EN EL 2022 PARA SUSTENTAR INGRESOS DE $44,847.03 MENSUALES.

> ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL CONSIDERAR EL VALOR DE LA PROPIEDAD INMUEBLE POR UN TÉRMINO MAYOR DE DOCE (12) MESES.

Por su parte, la señora Sterlin compareció ante nos el 27 de junio de 2024, mediante escrito intitulado *Oposición a que se Expida Certiorari.* En ajustada síntesis, la Apelada sostiene que mediante la *Resolución* apelada el foro primario acogió el Informe sometido por la EPA quien a su vez examinó los testimonios de la Apelada, del Apelante y de su perito, el Contador Público Autorizado (CPA), Nelson Traverso Rodríguez. Sobre esos extremos, argumenta la Apelada que las determinaciones de la EPA fueron todas producto de su apreciación de la prueba y validadas en gran parte por el testimonio en sala del perito del Apelante.

Sostiene además, la señora Sterlin que los señalamientos de error del Apelante versan precisamente sobre la apreciación de la prueba oral desfilada sin que el señor Verrengia hubiese dado cumplimiento a lo establecido en la Regla 19 del Reglamento del Tribunal de Apelaciones 4 LPRA Ap. XXII-B, R 19, que exige en estos casos la reproducción de la prueba oral y acreditar en el

término de diez (10) días de haberse presentado la apelación, el método de reproducción de la prueba oral que utilizaría.

Examinados los escritos de las partes y sus respectivos anejos estamos en posición de resolver.

## II
### A.

Los casos de alimentos de menores están revestidos del más alto interés público. *Torres Rodríguez v. Carrasquillo Nieves,* 177 D.P.R. 728 (2009); *Toro Sotomayor v. Colón Cruz,* 176 D.P.R. 528 (2009); *McConnell v. Palau*, 161 D.P.R. 734 (2004 La *Ley Orgánica de la Administración para el Sustento de Menores* Ley Núm. 5 de 30 diciembre de 1986, (Ley Núm. 5 o ASUME), 8 L.P.R.A. sec. 501 *et seq.*, según enmendada, establece un mecanismo para otorgarle cierta uniformidad al proceso de fijar la cuantía de una pensión de alimentos. El proceso de fijar una pensión consiste en que ambas partes expongan cuáles son sus bienes, bajo juramento, en una planilla conocida como la Planilla de Información Personal y Económica (PIPE) según dispone la Ley de ASUME, 8 L.P.R.A. sec. 515. El Art. 19 de la Ley de ASUME, establece que al determinar los recursos económicos del obligado a pagar una pensión alimenticia se tomará en consideración, además del ingreso neto ordinario, "el capital o patrimonio total del alimentante".[18] Además, el Art. 2(20) de la Ley de ASUME define los ingresos de la siguiente manera:

> (20) Ingresos.- Comprende **cualquier ganancia, beneficio, rendimiento o fruto derivado de** sueldos, jornales o compensación por servicios personales, incluyendo la retribución recibida por servicios prestados como funcionario o empleado del Estado Libre Asociado de Puerto Rico; del Gobierno de Estados Unidos de América, el Distrito de Columbia; las Islas Vírgenes de Estados Unidos de América; o cualquier territorio o posesión sujeta a la jurisdicción de Estados Unidos de América, según lo permitan las leyes y reglamentos

---

[18] 8 LPRA § 518.

federales aplicables.........; o de profesiones, oficios, industrias, negocios, comercio o ventas; o de operaciones en propiedad, bien sea mueble o inmueble, que surjan de la posesión o uso del interés de tal propiedad. **Asimismo contempla los derivados de intereses, rentas, dividendos, beneficios de sociedad, valores o la <u>operación de cualquier negocio explotado con fines de lucro o utilidad; y ganancias, beneficios, rendimientos, fondos, emolumentos o <u>compensación derivados de cualquier procedencia,</u> incluyendo compensaciones como contratista independiente, compensaciones por desempleo, compensaciones por incapacidad, beneficios de retiro y pensiones o cualquier otro pago que reciba un alimentante de cualquier persona natural o jurídica.** 8 LPRA § 501 (20).

(Énfasis suplido)

La capacidad económica de cada alimentante se determina al tomar en cuenta todos los ingresos que devenga, hasta los que no aparecen informados en la Planilla de Información Personal y Económica. Esto significa que el tribunal de instancia no está limitado a considerar únicamente la evidencia testifical o documental sobre los ingresos. En este ejercicio de determinar los ingresos de un alimentante, el Tribunal Supremo ha reconocido la aplicación de la llamada "doctrina de imputación de ingresos". Bajo esta doctrina, al fijar la cuantía de la pensión alimentaria se pueden considerar y tomar en cuenta aspectos tales como: el estilo de vida que lleva el alimentante, su capacidad para generar ingresos, la naturaleza y cantidad de las propiedades con que cuenta, la naturaleza de su empleo o profesión y sus otras fuentes de ingreso. *Arguello v. Arguello,* 155 D.P.R. 62, 72, 73 (2001); *Rodríguez Rosado* v. *Zayas Martínez,* 133 DPR 406, 412 (1993); *López* v. *Rodríguez,* 121 DPR 23, 33 (1988). Además, es permisible que los tribunales tomen en cuenta en estos casos la llamada "realidad de la economía subterránea que prevalece en Puerto Rico". *López v. Rodríguez,* 121 D.P.R. 23,33 (1998). De esta manera, el tribunal tomando en cuenta todos los criterios y factores anteriormente esbozados puede inferir si el alimentante

cuenta o no con medios suficientes para cumplir con su obligación alimentaria. *Íd*. Los ingresos del alimentante pueden ser determinados a base de evidencia circunstancial sobre su estilo de vida y gastos.[19] Ante la realidad de que muchas personas no declaran la totalidad de sus ingresos reales, se deben considerar todos los ingresos del alimentante aun cuando no aparezcan informados en la *Planilla de Información Personal y Económica*.[20] Al imputarle ingresos al progenitor alimentante más allá de los que alega recibir, los tribunales de instancia pueden tomar en consideración su estilo de vida, propiedades, profesión y preparación académica, historial de empleo, ingresos experiencia laboral, la capacidad y aptitud para generar ingresos. Además, pueden inferir de la prueba circunstancial presentada que el alimentante tiene medios suficientes para cumplir con la obligación impuesta. *Arguello v. Arguello, supra*, págs. 74-75.

Para poder determinarse la cuantía de una pensión de alimentos debe considerarse además de los ingresos ordinarios, aquel capital o patrimonio total del alimentante. 8 LPRA § 518. De igual modo, debe considerarse aspectos tales como el estilo de vida del alimentante, su capacidad para generar ingresos, la naturaleza y cantidad de propiedades con que cuenta, la naturaleza de su empleo o profesión y sus otras fuentes de ingreso. Por consiguiente, para que el Tribunal pueda fijar una pensión de alimentos justa y proporcional debe evaluarse todos los ingresos de las partes incluyendo aquellos que no aparezcan informados en la *Planilla de Información Personal y Económica*.

Sobre estos extremos, es preciso destacar que "[l]a definición de ingreso que encontramos en la Ley Número 5 nos

---

[19] *Argüello* v. *Argüello,* supra, pág. 74;
[20]; *Argüello* v. *Argüello,* supra, págs. 72-73.

revela un hilo conductor: la estrecha relación entre este término y los conceptos *esfuerzo, trabajo y ganancia*.” *Fonseca Zayas v. Rodríguez Meléndez,* 180 DPR 623, 646 (2011).

En virtud de la Ley Orgánica de la ASUME, *supra,* se adoptó el Reglamento Núm. 8529 del 30 de octubre de 2014, intitulado *Guías Mandatorias para Computar las Pensiones Alimentarias en Puerto Rico (Guías Mandatorias)* para determinar y modificar las pensiones alimentarias para menores de edad.[21] Art. 19, Ley Orgánica de la ASUME, 8 LPRA sec.518.

De otra parte, para los efectos de dicho reglamento, un **ingreso no recurrente** es aquel que cualquiera de las personas “recibe una vez sin la expectativa de volver a recibirlo”. *Véase,* Artículo 7 (21) las *Guías Mandatorias.* De igual forma dispone el Artículo 9(1)i nciso (e), que el ingreso bruto anual de la persona custodia y la persona no custodia se fijará a tenor de las siguientes reglas:

 a. [...]
 b. [...]
 c. [...]
 d. [...]
 e. En los casos en los que cualquiera de las personas reciba **ingresos no recurrentes**, según se define dicho concepto en este Reglamento, **el juzgador o la juzgadora los tomará en consideración para el año en el cual la persona los recibe. Para efectos de este inciso, el año comenzará a transcurrir a partir de la fecha en la que la persona reciba dicha cantidad. En estos casos, el juzgador o la juzgadora deberá computar una pensión alimentaria para el año en que se considerarán los ingresos no recurrentes y otra pensión alimentaria a partir del momento en el que los ingresos de la persona excluyen la partida por concepto de ingresos no recurrentes**. (Énfasis suplido)

---

[21] Guías aplicables al presente caso.

En lo pertinente, el Artículo 7 (22) de las *Guías Mandatorias* define además, un **ingreso periódico no frecuente** como aquel "[i]ngreso que cualquiera de las personas recibe o recibirá periódicamente, pero con una frecuencia que excede los treinta y seis(36) meses."

**B.**

Como norma general, un tribunal apelativo debe respeto a la adjudicación de credibilidad del juzgador primario de los hechos, pues solo tiene ante su consideración, los "récords mudos e inexpresivos". *SLG Rivera Carrillo v. A.A.A.*, 177 DPR 345, 356 (2009); *Trinidad v. Chade*, 153 DPR 280, 291 (2001). Ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, no se favorece la intervención de los foros apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia. *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.*, 209 DPR 759, 778 (2022); *Santiago Ortiz v. Real Legacy Assurance Company, Inc.*, 206 DPR 194, 219 (2021). Cónsono con lo anterior, la Regla 42.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 42.2, dispone que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos".

El Tribunal Apelativo no celebra juicios plenarios, no presencia el testimonio oral de los testigos, no dirimimos credibilidad, ni hacemos determinaciones de hecho, ya que esa es la función del Tribunal de Primera Instancia. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Por el contrario, al

momento de analizar prueba documental, prueba pericial o testimonios de testigos ofrecidos mediante declaraciones escritas, estamos en la misma posición que el foro primario. *Ortiz et al. v. S.L.G. Meaux*, 156 DPR 488, 495 (2002).

Tomando en consideración lo antes expresado, enfatizamos que los foros apelativos aceptamos como correctas las determinaciones de hechos de los tribunales de instancia, al igual que su apreciación de los testigos y el valor probatorio de la prueba presentada en sala. Tal deferencia se fundamenta en que las tareas de adjudicar credibilidad y determinar lo que realmente ocurrió, depende en gran medida de la exposición del juzgador a la prueba presentada. Son los jueces de instancia, los que tienen la oportunidad de ver el comportamiento de los testigos o *demeanor. Dávila Nieves v. Meléndez Marín*, supra, pág. 771.

La deferencia a las determinaciones de hechos cede cuando "éstas carezcan de base en la prueba o cuando se determine que existió pasión, prejuicio o parcialidad". *Moreda v. Rosselli*, 150 DPR 473, 479 (2000). En ese sentido, "si de un análisis de la totalidad de la evidencia este Tribunal queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, las consideraremos claramente erróneas". *Dávila Nieves v. Meléndez Marín, supra,* pág. 772; *Abudo Servera v. A.T.P.R.*, 105 DPR 728, 731 (1977).

### c.

En cuanto a la prueba para sustentar los errores que contienen elementos de suficiencia de la prueba es preciso destacar que la Regla 19 inciso (A) y (B) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 19, establece que

la parte apelante que haya señalado algún error relacionado con la suficiencia de la prueba testifical o con la apreciación errónea de esta, someterá una transcripción, una exposición estipulada o una exposición narrativa de la prueba y acreditará dentro término de diez días siguientes a la presentación de la apelación que dicho método que utilizará propiciará la más rápida dilucidación del caso.

De otra parte, la Regla 76 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 76, establece los requisitos para presentar la transcripción. Una parte en una apelación o en un recurso de *certiorari* notificará al Tribunal de Apelaciones, no más tarde de diez (10) días desde que se presentó el escrito de apelación o se notificó la expedición del auto solicitado, que se propone transcribir la prueba oral. La parte proponente expresará las razones por las cuales considera que la transcripción es indispensable y que propicia mayor celeridad en los procesos que la presentación de una exposición estipulada o una exposición narrativa. Regla 76 (A) del Reglamento del Tribunal de Apelaciones, *supra*. El inciso B de la referida regla dispone que, una vez autorizada la transcripción, su proponente podrá solicitar al Tribunal de Primera Instancia la regrabación de los procedimientos. La moción a esos efectos será presentada dentro de los diez (10) días siguientes a la notificación de la orden del Tribunal de Apelaciones. Regla 76 (B) del Reglamento del Tribunal de Apelaciones, *supra*.

Las disposiciones reglamentarias pertinentes también establecen los términos para la presentación de la exposición narrativa. Regla 76.1 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 76.1. La Regla 76.1 (A) (1) dispone que,

dentro de los diez (10) días de haberse notificado el escrito de apelación, la parte apelante deberá notificar a la apelada que se propone presentar la exposición narrativa. Asimismo, en el inciso 2 de ese precepto se dispone que, dentro de los treinta (30) días siguientes a la presentación de la apelación, la parte apelante preparará y someterá al Tribunal de Apelaciones un *Proyecto de Exposición Narrativa de la Prueba Oral* pertinente al recurso. Regla 76.1 (A) (2) del Reglamento del Tribunal de Apelaciones, *supra.*

La Regla 76 de nuestro Reglamento, *supra,* dispone los requisitos necesarios para la transcripción de la prueba oral que debe presentar la parte apelante en estos casos.

El Tribunal Supremo de Puerto Rico ha resuelto que las partes vienen obligadas a cumplir cabalmente con el trámite prescrito en las leyes y reglamentos aplicables para el perfeccionamiento de los recursos y no puede quedar al arbitrio de estas elegir qué disposiciones reglamentarias deben acatarse y cuándo. *Pueblo v. Pérez Delgado*, 211 DPR 654, 671 (2023), resuelto el 23 de marzo de 2023; *Hernández Maldonado v. Taco Maker,* 181 DPR 281, 290 (2011). De esta forma, es tarea del peticionario presentar al foro revisor la prueba oral bajo la que se pretende impugnar las determinaciones del tribunal *a quo. Íd.*

Sobre estos extremos en *Pueblo v. Pérez Delgado, supra a la pág. 671* nuestro más Alto Foro dispuso expresamente lo siguiente:

> [C]uando un peticionario señala errores dirigidos a cuestionar la apreciación o suficiencia de la prueba, la naturaleza del derecho apelativo requiere que este ubique al foro revisor en tiempo y espacio de lo ocurrido en el foro primario utilizando alguno de los mecanismos de recopilación de prueba oral, como son : (1) transcripción de la prueba, (2) exposición estipulada, o (3)exposición narrativa. Los tribunales

de mayor jerarquía no pueden cumplir a cabalidad su función revisora sin que se le produzca, mediante alguno de estos mecanismos, la prueba que tuvo ante sí el foro primario.

[…]

…De esta forma, es tarea del peticionario presentar al foro revisor la prueba oral bajo la que se pretende impugnar las determinaciones del tribunal *a quo*

### III

Es la contención del Apelante en sus señalamientos de error que incidió el foro primario al concluir que este devengó dividendos en el 2020 y vendió las criptomonedas en el año 2022, lo que lo llevó a generar ingresos de $44,847.03 mensuales. Sobre estos extremos, el Apelante razona además, que en todo caso las criptomonedas no son ingresos ni tampoco son ingresos imputables para el cómputo de la pensión alimentaria, por lo que incidió el TPI al incluir las criptomonedas como parte de sus ingresos personales. Sostiene, además, el señor Verrengia que el valor de la propiedad inmueble ya había sido considerado y que incidió el TPI al considerar el valor de dicha propiedad inmueble por un término mayor de doce meses.

Durante la vista celebrada ante la EPA declaró el Sr. Nelson Traverso Rodríguez, CPA, que fue presentado como testigo del Apelante. Tras escuchar dicho testimonio, la EPA incluyó en el *Informe* varias determinaciones de hechos. Dicho Informe aprobado por el foro primario, dispuso expresamente en la determinación de hecho número cuatro (4) lo siguiente:

> "El perito declaró que las criptomonedas son unas representaciones digitales de un valor que sirve como medio de intercambio; **no son equivalente a dinero efectivo, sino que se pueden vender o intercambiar por dinero. Lo importante, para efectos del caso de pensión alimentaria es que al realizar una transacción de compra y venta de criptomonedas se pueden generar ingresos**."

Establecido lo anterior, la EPA determinó como ingreso del Apelante para el año 2022 la suma de $508,164.30, como ganancias por concepto de criptomonedas vendidas.

Sobre estos extremos, en lo pertinente a la definición de ingresos, el Artículo 2(20) de la Ley Núm. 5, supra, establece para efectos del cómputo de una pensión alimentaria que dicho término **contempla los derivados de intereses, rentas, dividendos, beneficios de sociedad, valores o la operación de cualquier negocio explotado con fines de lucro o utilidad; y ganancias, beneficios, rendimientos, fondos, <u>emolumentos o compensación derivados de cualquier procedencia,</u> incluyendo compensaciones como contratista independiente, compensaciones por desempleo, compensaciones por incapacidad, beneficios de retiro y pensiones o cualquier otro pago que reciba un alimentante de cualquier persona natural o jurídica.** 8 LPRA § 501 (20).

**Al interpretar el alcance amplio del concepto ingreso según definido en la Ley Núm. 5,** *supra* **y la jurisprudencia interpretativa, utilizamos como criterio** la estrecha relación entre este término y los conceptos *esfuerzo, trabajo y ganancia.*" Véase, *Fonseca Zayas v. Rodríguez Meléndez* **. En atención a lo anterior concluimos que las ganancias obtenidas por el Apelante por concepto de criptomonedas constituye ingreso** para efectos del cómputo de una pensión alimentaria por el término en que lo obtuvo **<u>ya que consiste de "*emolumentos o compensación derivados de cualquier procedencia*" para lo cual requirió esfuerzo, trabajo del Apelante.</u>**

De igual forma, en lo pertinente al señalamiento de error del Apelante sobre la propiedad inmueble, que este pagó en su

totalidad usando el valor de las criptomonedas, reiteramos que según la definición de ingreso contemplada por la Ley Núm. 5, *supra*, ello incluye **cualquier ganancia, beneficio, rendimiento o fruto derivado de un negocio.** Provee además, el Artículo 19 de la Ley Núm. 5, supra, 8 LPRA sec. 518, que además del ingreso neto, se considerará el capital o patrimonio total del alimentante para fijar la pensión alimentaria que éste deba satisfacer.  A esos efectos, en el Informe de la EPA, adoptado por el foro primario, la EPA realizó determinaciones de hechos luego de escuchar el testimonio del Sr. Nelson Traverso Rodríguez, CPA que declaró en la vista y aplicó el cálculo que, según su apreciación, había que utilizar para determinar el ingreso por concepto de criptomonedas.  Así las cosas, la EPA calculó la ganancia de capital que generó la disposición de criptomonedas y no el valor del inmueble.  Para ello, la EPA consideró el valor de la criptomoneda en el momento de su adquisición y el valor de dichas criptomonedas al momento en que se dispuso de ellas para que el Apelante saldara el inmueble.  Cabe señalar, que de esta forma se determinó la ganancia que el peticionario obtuvo respecto a dichas criptomonedas.  Si bien dicho ingreso es uno periódico, la EPA calculó e imputó el mismo conforme a lo dispuesto en las en las *Guías Mandatorias*,

En adición a lo anterior, el alto interés público de asegurar el bienestar de los menores alimentistas y el derecho de éstos a recibir alimentos, como uno que es inherente a su derecho a la vida, podría requerir una interpretación aun más abarcadora del concepto ingreso. *Llorens Becerra v. Mora Monteserín, supra, p.1024.*

Además, es preciso destacar que la Asamblea Legislativa estableció, en el Artículo 3 de la Ley Núm. 5, una política pública de interpretación liberal de la Ley a favor de los mejores intereses del menor o alimentista que necesita alimentos. Así también, la Ley Núm. 5, *supra*, hace referencia al concepto de ingreso neto en el Artículo 2(19). Este Artículo añade la posibilidad de que se tomen en consideración otros factores, como proyecciones de ingresos, gastos y estilo de vida, para determinar el ingreso a partir del cual se calculará una pensión alimentaria mensual.

En consideración a lo anterior, **y conforme a la abarcadora definición e interpretación del término "ingresos" contemplada en nuestro ordenamiento jurídico, concluimos que no incidió el foro primario al incluir los beneficios que ha recibido el señor Verrengia por concepto de criptomonedas como ingresos que forman parte del cálculo de la pensión alimentaria en beneficio de la menor Q.Y. S.V**.

En lo referente a aquellos extremos de los señalamientos de error del Apelante relacionados a la apreciación de la prueba oral por parte del foro primario, no contamos con los elementos probatorios para sustituir nuestro criterio por el del TPI, mucho menos ante la ausencia de la transcripción de la prueba oral. Además, surge de las determinaciones de hechos objeto de la Resolución emitida por el foro primario que el TPI no adjudicó credibilidad al testimonio del Apelante. Particularmente la Determinación de Hecho Núm. 4 expresamente dispuso lo siguiente:

> **El señor Verrengia declaró que no ha podido devolver el dinero recibido en calidad de préstamo ya que su capacidad económica no se lo ha permitido. Sin embargo, no se presentó prueba testifical ni documental que acredite que el dinero fue recibido en calidad de préstamo; tampoco se presentó prueba en contrario. El promovido declaró que tomó dinero**

**prestado y que no ha podido devolverlo. No especificó la manera en que se llevaría a cabo la restitución del dinero prestado. La Examinadora no consideró las sumas de dinero que el señor Verrengia declaró, bajo juramento, que recibió como préstamos; de la misma manera que no consideró el dinero recibido en calidad de préstamo por la parte promovente de su mamá, familiares y de la iglesia.**[22]

La apreciación de prueba oral desfilada ante la Examinadora de Pensiones Alimenticias e incluida en su Informe, a su vez acogido por el Tribunal de Primera Instancia en la Resolución sobre alimentos, merece nuestra deferencia. Ante la ausencia de algún método de reproducción de la prueba oral presentado por parte del Apelante, al cual podamos acudir, carecemos de elementos, así como de autoridad para intervenir con dicha apreciación.

A la luz de lo anterior, sobre estos extremos, no hallamos los fundamentos requeridos para dictaminar que el Tribunal de Primera Instancia actuó de forma arbitraria, caprichosa, o incurrió en craso abuso de discreción en la apreciación de la prueba ni en aplicación de la ley.

**IV**

Por los fundamentos anteriormente expuestos, los cuales hacemos formar parte de esta Sentencia, confirmamos el dictamen apelado.

**Notifíquese inmediatamente**.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones

---

[22] Véase Determinación de Hecho Núm. 4 del Informe de la EPA, adoptado íntegramente por el foro primario en la *Resolución* objeto de Apelación.